THE PEOPLE, Plaintiff and Respondent, v. TOLLIVER SKINNER, Defendant and Appellant.

Donald J. Regan, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

BROWN (Gerald), P. J.—This is an appeal by Tolliver Skinner, the defendant, from a judgment of conviction on

two counts of first degree murder based upon the felony murder rule.

On March 12, 1963, at 2:45 p.m. William Moore, a codefendant, entered a bank in Santa Ana and thrust a note to a bank official which read: "This is a hold up. Do as you are told. Try to be a hero and you are a dead man." Simulating a gun in his pocket Moore commanded the official to direct a secretary to empty cash into a sack. In a few moments Moore emerged and ran to a 1953 Oldsmobile which sped off. The Oldsmobile was owned and driven by Skinner. Several witnesses testified that the car was waiting with its motor running. An off-duty policeman in the vicinity, learning of the robbery, pursued the Oldsmobile in his private car. Soon the off-duty officer intercepted a police vehicle. Advising the on-duty officer of the events the chase continued in the police car. The Oldsmobile was traveling between 80 and 100 miles per hour. The police were gaining on the fleeing car when it crashed into a Volkswagon bus killing two passengers. Moore and Skinner were immediately arrested.

They were indicted on two counts of murder, appointed separate counsel, and tried together. Skinner defended on the ground he was not aware Moore intended to rob the bank.

Skinner was interrogated on several occasions. At the scene of the collision he gave his name and address to an investigating officer, and admitted driving the car. He was interrogated at the police station that evening, but the content of this interrogation was not produced in evidence.

On five other occasions on March 13 and 14, 1963, Skinner was interrogated by a police officer and an investigator from the district attorney's office, and at least on one occasion, March 18, 1963, by an FBI agent. Three of the five interrogations by the local officers were tape recorded. The tapes were played for the jury.

The first interrogation on March 13, 1963, was recorded. In the course of this interrogation Skinner admitted having known his codefendant Moore for 6 to 8 weeks; admitted he drove Moore to the bank; admitted his ownership of the Oldsmobile; stated that although he had no knowledge of Moore's plan to rob the bank, he knew things were not right when Moore ran from the bank carrying a white bag; stated he drove away from the bank not out of fear induced by Moore's threats, but because he was afraid of what the police might do to him if he were caught; admitted driving the car

at speeds up to 85 miles per hour; admitted driving through stop signs along the route; admitted Moore told him the police were pursuing them; and admitted the deaths were his fault. Throughout this interrogation Skinner denied he knew of Moore's plan to rob the bank.

The second interrogation on March 13, 1963, was not recorded. The investigator testified that Skinner said he did not want to make a statement until he talked to his attorney; he first denied, but later admitted having played with the toy gun Moore used in the robbery; again stated he would make no statement until he talked to his attorney. When asked what he would do if his attorney told him to keep lying the investigator testified that Skinner replied, "I guess I will take his advice."[1] The balance of the interview was largely a reiteration of the first interrogation.

Skinner's next interrogation on the morning of March 14, was recorded. On 13 occasions in the course of this interview Skinner stated he was not going to make a statement. On three occasions he stated a lawyer had told him not to make a statement. The following is an excerpt from the interrogation:

"A. (By Mr. Skinner) I'm not going to make a statement, sir.

"Q. (By the Investigator) Now, can you give me a reason why, Toll? (Toll is Skinner's nickname.) A. Yes, sir.

"Q. All right. Would you give me a reason? A. My lawyer asked me not to make any statements or anything.

"Q. (By the Officer) When did he ask you this? A. Yesterday.

"Q. Before you were here? A. Yes, sir.

"Q. Well, of course, you talked to us yesterday, Toll. A. Yes, sir.

"Q. ——denying your guilt. Right? A. Yes, sir.

"Q. Now, all of a sudden this new thing comes up and you want to stick to what your attorney said. This in itself——A. I didn't—I didn't—I told them yesterday when I was in this office that I didn't want to make a statement. Isn't that correct, sir?

"Q. You made a statement though, right? A. I didn't make one yesterday in this office.

---

[1]Skinner was asked this same question during a recorded interrogation on the morning of March 14, 1963. At this time he replied: "He's not going to tell me to lie."

"Q. You didn't talk to us yesterday? A. *I didn't make a statement*. Isn't that correct?

"Q. (By THE INVESTIGATOR) He didn't make a statement as to what happened. Toll—I am convinced that Toll wants to tell but he doesn't know what to do." [Italics ours.]

The second interrogation on March 14, 1963, was not recorded. The details of this interrogation were not admitted in evidence. The investigator testified that the "good guy-bad guy technique"[2] was put into operation at this point.

The third interrogation which was recorded began with the investigator, "the bad guy," returning to the room after having "blown up" and left Skinner alone with the "good guy," the officer. The investigator started the interrogation by asking Skinner to tell him what he told the "good guy" in his absence. Skinner admitted he had not told the whole truth, although he denied having lied; stated he did not want to answer certain questions, saying: "I don't know how much —as much about the law as there is, sir. I don't know what my rights are or anything."

"                                                 .

"I'd rather not say any more until I talk to my attorney." Skinner was asked whether he would tell his attorney the truth. He said he would. *He was asked whether he would tell his attorney he knew of the robbery before it happened. He admitted he had already told his attorney he knew about the robbery beforehand, but steadfastly refused to tell the officers he knew on the ground he had been advised not to make a statement.*

On March 18, Skinner was interrogated by an FBI agent. So far as the record before us is concerned he was fully advised of his rights to counsel and to remain silent for the first time during this interview. He admitted to the FBI agent he knew of the robbery before it took place.

At the trial Skinner admitted having made the incriminating statements attributed to him, but denied their truth stating they were products of coercion. A continuing objection to the admissibility of all of the statements was interposed on the grounds the statements were "obtained by illegal means, by coercion, force, and so on."

█ The judgment must be reversed under *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

[2]See *People* v. *Dorado*, 62 Cal.2d 338, 345, footnote 2 [42 Cal.Rptr. 169, 398 P.2d 361].

The interrogations of March 13 and 14, after Skinner's arrest, were clearly designed to elicit incriminating statements. The accusatory stage had been reached. (*People* v. *Stewart*, 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].) The record does not show Skinner was advised of his rights to counsel or to remain silent before these interrogations. ■ The advice Skinner received from an attorney[3] to sign nothing and to make no statement was inadequate. It is apparent from the record Skinner understood this to mean he was not to make a formal confession; he did not understand he had a right to remain absolutely silent; he did not recognize the series of admissions he made—constituting a complete confession—as a statement. ■ When he asked whether he had made a statement the investigator led him to believe he had made none. There was no intelligent waiver of rights. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 352-353.) The admission of this confession corroborated the making of the later confession to the FBI and under the circumstances of this case (particularly Skinner's denial of the truth of the confessions) was prejudicial error. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 356-357; *People* v. *Lilliock,* 62 Cal.2d 618, 622, headnote 1b [43 Cal.Rptr. 699, 401 P.2d 4].)

Judgment reversed.

Coughlin, J., and Finley, J. pro tem.,* concurred.

---

[3]Skinner refers to ''my attorney'' on several occasions. Actually Skinner didn't have counsel until the public defender was appointed to represent him on April 5, 1963. The attorney Skinner is referring to was Moore's attorney who talked to Skinner about two minutes on the morning of March 13, 1963. The attorney told Skinner at this time he probably could not represent him due to a conflict in interest.

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.