[Crim. No. 15255. In Bank. Apr. 22, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
THEODORE ANTHONY BYNUM, Defendant and Appellant.

## Counsel

Richard H. Levin, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**McCOMB, J.**—Defendant was charged with the murder of Mrs. Beatrice Loya (Pen. Code, § 187). He pleaded not guilty. A mistrial was declared after the first jury was unable to reach a verdict. The second jury found him guilty of murder in the first degree. The jury became deadlocked on the penalty phase, however, and was dismissed by the court. The court sentenced him to state prison for the term of his natural life (Pen. Code, § 190.1).

When the evidence is viewed in the light most favorable to the People as we are bound to do following a guilty verdict, the record discloses that on November 26, 1968, Mrs. Loya reported for work at 4:28 p.m. at Coast Plastic Packaging located on 23d Street in Los Angeles. She had about $80 in bills in a blue wallet in her purse and she placed therein the paycheck she received that night. She was assigned to a machine in the eastern section of the shop by Mr. Douglas Wright, the swing shift foreman. She placed her purse upon a bench behind her machine. Her machine was located near an open door, about 10 feet wide, facing the loading dock on 24th Street. The other employees were working 30 to 40 feet away in the western section of the shop. Boxes were stacked between the two sections limiting visibility. All the machines were noisy, and one had to yell to be heard above the noise.

Mr. Wright saw Mrs. Loya several times during the evening when he passed her machine, the last time being about 8 p.m. At 8:20 the shopowner notified him that Mrs. Loya was not at her machine. Mr. Wright had never known her to leave her machine running while she was away from it. The two men searched the premises and found her car outside but could not find her. She had not returned by 9 p.m. when the employees returned from their meal break. The employee assigned to operate Mrs. Loya's machine discovered blood on the floor behind the machine and notified Wright. He found drops of blood leading from the machine to a nearby

pallet, a blood smear on the pallet, and a bloody smear resembling a drag mark on the floor from the pallet to the loading dock door. One of Mrs. Loya's shoes was on the ground below the loading dock between two cars parked there and there were drops of blood on the ground. At 9:10 p.m. Wright called the police, who arrived at 9:15.

The officers found a blood smear on the door of the loading dock and on the hood of one of the cars. They followed drops of blood some 100 feet across the street and over a sidewalk to a weed-filled area. The drops on the sidewalk were about the size of a quarter. There were no large groups. They were "more like a trail" of blood. The body of Mrs. Loya was found in the lot. Her bloodstained dress, bra and slip were up around her neck, her panty hose were ripped apart and her genital area was exposed. Plant material of the type growing in the area adhered to her clothes. Search of the neighborhood for a blunt object with blood on it was unsuccessful. Her purse and contents were never found.

An autopsy was performed about 11 a.m. the next day by Dr. Horace L. Spear, who found wounds to the jaw bone, the right ear, and the back of the scalp. In his opinion these were inflicted with a blunt instrument, causing a number of injuries to the brain, any one of which could have caused death. There was a bruise on her chest and a large abrasion across the right side of her back, which appeared to him to have resulted from the body being dragged. In his opinion death could have occurred from a minute to an hour, but probably occurred within 10 to 15 minutes of the time the blows were inflicted.

Dr. Spear found no visible trauma to the victim's vaginal area. Examination of a vaginal smear revealed the presence of semen and acid phosphatase but no spermatozoa. He could not ascertain with reasonable medical certainty whether Mrs. Loya had sexual intercourse within 15 hours of her death. He explained that acid phosphatase is a chemical which is found in large quantities in the seminal fluid released by the male at the time of sexual climax, but it is not found in the vagina in amounts detectable with the tests used unless semen is deposited there. Spermatozoa are usually present in the semen but there are instances when they are not, as when the testicles have been removed or are diseased and are no longer producing spermatozoa.

Semen is not recognizable as semen in the vagina five minutes after emission because it then looks like any clear liquid. It can be detected on clothes a matter of months later. Spermatozoa are recognizable much longer than the time mentioned for the physical appearance of semen. The detectable presence of spermatozoa diminishes but not in the same way as acid

phosphatase. Many variable factors influence the rate of disintegration of the recognizable form of spermatozoa. With acid phosphatase there is a steady decrease in the quantitative measurement after intercourse depending upon variable factors, but the decrease continues whether the body into which it is deposited is alive or dead. It is detectable for as long as 12 to 24 hours after deposit. A significantly large amount would be designated as "four plus" on a test scale which descends to "one plus," "a trace," and "absent." In the specimen here examined there was a reading of "two plus," which would indicate that a larger quantity was present earlier. This was a "borderline result" and did not positively rule in or rule out the occurrence of sexual activity shortly before death, the doctor testified.

Defendant was never seen with Mrs. Loya or at Coast Plastics. He was placed in the vicinity of the crime under suspicious circumstances by Harry Swann. Mr. Swann died before the trial but he testified and was extensively cross-examined at the preliminary hearing held January 27, 1969. Over defense objections, this prior testimony was admitted at the trial.

On the evening in question he was behind a liquor store at 24th and Long Beach sitting next to a 50-gallon drum, in which a wood fire was burning. (This store was about two blocks from Coast Plastics.) Defendant, whom he knew, came up to him and offered him $2 for a ride. Mr. Swann noticed what appeared to be fresh bloodstains splattered on the front of defendant's suit coat from the shoulders all the way down to the bottom of the jacket. He told defendant that he couldn't go with him with that coat on because if the police saw it they would both go to jail, and that he didn't know what happened but he didn't want defendant in his car with that coat on. At Swann's suggestion defendant put the coat in the fire. The two men then got into Swann's car and went to a liquor store at 27th and Hooper. Defendant told Swann that he had had a misunderstanding with his wife and that he had nicked himself. Mr. Swann did not see any cuts on defendant. He did see defendant flip through a pink or red wallet containing about $50 to $70 while they were in the car. Defendant made some purchases, paid Swann the $2 and Swann drove him home. Defendant wore a green coat, dark pants and a turtleneck sweater.

Swann gave conflicting testimony as to the time when defendant came to him at the barrel. On direct examination he gave the time as between 8 and 9 p.m.; on cross-examination he stated it was between 7 and 8 p.m.; on redirect, he stated it was between 7 and 8 p.m., but when shown his prior statement to the police he stated that the writing correctly stated that

the time was between 8 and 9 p.m.; on recross he reaffirmed that it was between 8 and 9 p.m.

Another witness, Frank Nabors, also placed defendant near the barrel after 8 p.m. Mr. Nabors was lying on the ground about 8 to 10 feet from the barrel when he heard the voices of defendant and Swann. He thought it was after 8 p.m. because the liquor store at 24th and Long Beach was closed. He heard defendant offer Swann $2 to take him some place. He heard Swann remark "Your coat is cut for high water" and defendant reply "Do you want to buy it?" After a period of silence he heard Swann ask "What all [sic] that on your coat?" He heard no discussion about blood or about burning a coat. Defendant left in Swann's car. About 8:30 two police officers came, returning again about 9 p.m. He said that another person, Preston Ishop, was also there but was asleep in an old car about 30 feet away.

The owner of the liquor store at 24th and Long Beach testified that it had closed at 8 p.m. on the night in question. A clerk at the liquor store at 27th and Hooper testified that it was after 8 when defendant made his purchases that night, and that he recalled it because of the unusual nature of the purchase (for defendant), $13 or $14. Defendant paid him with a $20 bill, and then asked him to change another $20.

Officer Kenneth D. Sturm was at the intersection of 24th and Long Beach at 8:30 on the night in question looking for two robbery suspects. Stopping by the barrel he saw Harry Swann, Frank Nabors, and Preston Ishop. He was not certain if there was a fourth person; and he did not see defendant. The fire was burning brightly, the flames being well above the barrel. At 8:35 he received another call and left. At 9:10 he received a call to investigate the Coast Plastics incident. About 10:30 he and his partner returned to the barrel but found only Frank Nabors still there.

Relying on information supplied by Swann, Officer Raymond E. Gendreau and his partner, Sergeant Tyrpak, went to defendant's home at 7:30 p.m. on December 3, 1968, to arrest him for the murder of Mrs. Loya. They immediately advised him of his constitutional rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). He stated that he understood these rights, that he waived them, and that he wanted to talk with the officers. They took him to the station and there, some 30 to 40 minutes later, they had a conversation with him, which they recorded and transcribed. It was read aloud to them by defendant, and signed by him.

In this statement defendant said that on Tuesday, November 26, he had worked until approximately 4 p.m., then had a few beers with his brother-

in-law, and that he returned home at exactly 5:30. His wife asked him to get her some cigarettes. He walked to the liquor store at 27th and Hooper, arriving there at 3 minutes to 6 and bought a pack of cigarettes. Instead of going home, he went down the railroad tracks to the liquor store at 24th and Long Beach, intending to pay $10 on his bill there, but the store was closed. The walk took him about 5 or 10 minutes. He went over to the barrel and saw Harry Swann, Frank Nabors and Preston Ishop. Mr. Ishop wanted money for wine and defendant gave him 50 cents, and when Ishop found the liquor store closed he went across the street to Bobo's for some chili. Defendant accepted a drink of whiskey from Swann, and offered him $2 to take him to the liquor store at 27th and Hooper. There he bought a fifth of Scotch, a six-pack of beer, some Pepsi and a carton of cigarettes. After he gave Swann a cupful of the Scotch and the $2, Swann drove him home. That night Mrs. Shirley (Gullie) Wilson came over for a party. Defendant, his wife, and Mrs. Wilson drank the liquor, went out at 10 or 11 p.m. for more, and at 2 a.m. went out again, and he and his wife walked home.

When asked where he got all that money defendant said that he drew on his salary during the week, that his cousin paid him $5, and that he had been in a dice game. He did not say whether he won or lost in the dice game. (His employer testified that defendant drew $52.44 on November 22 and that the check cleared the bank on the 25th.) Defendant said that he wore a turtleneck sweater, grey pants with a matching grey coat, and the black shoes that he was wearing at the time of his arrest; and that he had left his grey coat in Swann's car that night. He explained that he had been in a fight with his wife and that was the reason for some blood-stains on his turtleneck sweater.

Mrs. Wilson testified for the prosecution that she had known defendant for several years, that he telephoned her about 9 p.m., and that he told her he was calling from a liquor store at 27th and Hooper, that he "had $185 to blow" and that he wanted her to come to a party. On cross-examination she testified that she was not certain of the date of this call. On redirect examination she admitted that she had been in an automobile accident after leaving defendant's house at 2 a.m. the next morning; also that she had made statements to Officer Gendreau and another policeman regarding the telephone call, that they wrote down her statement and she signed it, but that she did not now recall the date of the call. To refresh her recollection she was shown a copy of her statement. She then testified that it was on a "Tuesday" but that she was not certain whether it was on November 26. On redirect examination she admitted that she had told the police that "when Theodore called me from the liquor store he said 'Come on over, because I have $185 tonight and we're going to blow it. We'll have a

Thanksgiving Eve get-together.'" Officer Richard O. Harper testified that at 2:30 a.m. on Wednesday, November 27, he had investigated the accident in which Mrs. Wilson was involved.

Donald H. Hale, a criminalist, examined five pairs of trousers and three pairs of shoes belonging to defendant. He found two bloodstains, approximately pinhead size, on one of the shoes that defendant had worn on the evening of November 26th. It was human blood, Type A, and appeared to be less than a month old. It was stipulated that both defendant and decedent had Type A blood. Chemical tests revealed traces of blood on a pair of blue trousers on the inseam of the left leg, on the cuff area and on the back of the right leg. These traces were not visible under the microscope. There was insufficient material for the expert to determine its type and if it was human blood. He found a white stain on the fly area of the blue trousers. Chemical tests revealed the presence of semen and sperm. He testified that spermatozoa tends to disappear under certain conditions.

Mr. Hale had been instructed to examine this clothing for blood and stains. He did not notice any seeds or burrs. At the first trial when the jury began its deliberations the first juror to examine the blue pants found a little foxtail caught in the thread of the right cuff. He called this to the attention of the other jurors and, subsequently, to the district attorney. At the second trial Henry Mukai, a botanist, compared the seeds found in the victim's clothing with the seed found in defendant's trouser cuff. They were from the same species of wild barley and were similar in size, coloration and maturity. This was some indication that they were growing in the same general area. It is a common specie, however, and grows wild in Los Angeles.

Defendant's wife testified on his behalf that he had arrived home at 7:30 p.m. on the night in question; that he went to the store for her at 7:45 and returned at 8:15; that she timed him when he left and returned; and that neither of them left the house again that night until about 9:30 or 10 p.m.

Defendant also testified, but his counsel questioned him only with regard to his statement to the police that he had given Ishop 50 cents to buy some wine. Defendant replied that when he gave the money to Ishop he thought the liquor store was open, that this was the time that he was around the barrel, that Ishop started toward the liquor store but never did go around to the front, and that Ishop went across the street to Bobo's cafe. Among the instructions given by the court was one on alibi evidence offered by defendant.

 *Questions: First. Was the evidence sufficient to support the verdict of guilt?*

*Yes.* The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." (*People* v. *Robillard* (1960) 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].) The People may rely on circumstantial evidence to connect the defendant with the commission of the crime charged and to establish beyond a reasonable doubt that he committed it. (*People* v. *Reilly, supra,* 3 Cal.3d 421, 424; *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal. Rptr. 379, 461 P.2d 659].)

 The evidence points to defendant's presence in the vicinity of the murder between 8 and 9 p.m. in a blood-spattered coat and with an unusual (for him) amount of money in his possession. Spots of relatively fresh Type A blood were thereafter found on one of the shoes worn by him that night. Traces of blood, a spot of semen and sperm, and a weed seed similar to the seeds found in the victim's clothing, were found on a pair of his trousers. The theory upon which the action was tried was that the murder was perpetrated in the course of rape and/or robbery, and there was evidence pointing to both.

The significance of the presence of spermatozoa in the spot on defendant's fly and the absence of spermatozoa in the vaginal smear taken from the decedent, was within the jury's determination. There was no medical evidence that it was impossible or inherently improbable that he could have raped the victim. The jury were free to draw inferences from the position of the body and the disarray of her clothes, as well as from the presence of semen in her vagina, that intercourse had occurred.

The fact that defendant otherwise accounted for the origin of the blood found on his trousers, shoe, and turtleneck sweater and the fact that the amount so found was small, did not require the jury to find his explanation credible nor to find him innocent. There was evidence that the victim may have died instantly. The blood found at Coast Plastic Packaging, on the street and on the sidewalk was described as "drops" of blood. The jury could choose to believe Swann's testimony that defendant wore a green, blood-spattered coat and burned it in the barrel. They could disbelieve his testimony that he wore a grey coat and left it in Swann's

car. His employer testified that he found the grey coat where defendant had left it, at his place of employment, and this coat was in evidence.

The conflicts in the evidence were resolved by the jury. The evidence clearly suffices to support the verdict of guilt.

■ *Second: Was it error to admit defendant's extrajudicial statement into evidence?*

*No.* Defendant was advised of his *Miranda* rights at his home immediately upon his arrest. Defendant urges that he should have been re-advised of these rights when he made his statement at a later time while he was in custody.

■ Whether one warning is sufficient to cover a subsequent interrogation is a factual question in each case. (*People* v. *Johnson* (1969) 70 Cal.2d 469, 477 [74 Cal.Rptr. 889, 450 P.2d 265].) ■ Here the interview followed within 30 to 40 minutes of the arrest, it lasted about an hour, and it was the same interrogation contemplated by the officers and understood by defendant when he stated that he waived these rights and that he wanted to talk to the officers. It was reasonably within the time served by the warning. (See *People* v. *Brockman* (1969) 2 Cal.App.3d 1002, 1006 [83 Cal.Rptr. 70]; *People* v. *Sievers* (1967) 255 Cal.App.2d 34, 38 [62 Cal.Rptr. 841].) The trial court correctly ruled that a proper *Miranda* warning had been given for the statement so elicited. It was properly admitted into evidence.

■ *Third: Was there error in permitting the testimony of Harry Swann to be read from the preliminary transcript?*

*No.* Proof was offered at the trial that Harry Swann was deceased. Section 1291 of the Evidence Code provides in part: "(a) Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: . . . (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

The transcript of the preliminary hearing was not placed in evidence at the trial but the court allowed Swann's testimony to be read pursuant to section 1291. This clearly indicates that Swann testified under oath; that he was thoroughly and vigorously cross-examined; and that he was subjected to redirect and recross examination. A preliminary hearing is ordinarily a less searching exploration into the merits of a case than a

trial but it cannot be denied that a searching exploration was made at the preliminary hearing into every aspect of Swann's testimony.

In his testimony Swann made inconsistent statements, and evidence was offered by the prosecution of prior extrajudicial statements made by him, all relative to the critical time factor when defendant was with him at the barrel. In response to a leading question, not objected to by defendant, he stated on direct examination that the time was between 8 and 9 p.m. Cross-examination immediately followed and he stated that the time was between 7 and 8 p.m. He gave no explanation, and none was requested by defense counsel, for the inconsistency with his statement on direct. He merely stated that his present recollection was that it was between 7 and 8 p.m., and that he had taken defendant to his home before 8 p.m., basing this recollection on the fact that the liquor store, which closes at 8 p.m., was not closed when defendant was with him at the barrel. Conflicting present statements were thus before the jury.

On redirect examination he adhered to his present recollection of the time. When the prosecution questioned him regarding his prior statement to the police and showed him the recorded and signed statement of the interview, he admitted that the facts were fresher in his mind when he made that statement, and that whatever statement was made in the written paper was true. The time there stated was "between 8 and 9 p.m."

On recross examination defense counsel questioned him at length regarding the making of the statement (his eyesight, ability to read, whether he read it before signing, whether the police "told him" what the time "should have been," whether the four-page document was numbered or stapled before he signed it) but he refused to be shaken as to the accuracy of the statements contained in the written report.

Extensive colloquy was held at the trial, outside the presence of the jury, on the nature of the prior extrajudicial statements of Swann, their admissibility and their effect. The court viewed it as being immaterial whether they were being offered as prior consistent testimony, prior inconsistent testimony, or past recollection recorded (Evid. Code, §§ 1235, 1236, 1237).[1]

---

[1] "§ 1235. Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Section 770 states the requirement that the witness was given an opportunity to explain or deny the inconsistency while being examined.

"§ 1236. Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." Section 791 limits the use of prior consistent statements to situations where credibility of the witness has been

He thought that they contained some impeachment and some rehabilitation, and might be used for refreshment of memory. He held them admissible but only for the limited purpose of determining credibility of the witness, and so advised the jury—informally at the time the transcript was read into evidence, and formally in the instructions.

The formal instruction read: "Evidence offered by the people that on some former occasion a witness made a statement or statements that were either consistent or inconsistent with his testimony in said transcript or in this trial, may be considered by you only for the limited purpose of testing the credibility of the witness. Testimony of such statements must not be considered by you as evidence of the truth of the facts as stated by the witness on such former occasion."

There was no error in the admission of the evidence or in the giving of the instruction. Under the decisional law of this state at that time, Evidence Code section 1235 was limited in its effect to the consideration of prior inconsistent testimony for purposes of credibility only. (*People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111]; *People* v. *Graham* (1969) 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Green* (1969) 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422], vacated by *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930].) Such evidence is now admissible as probative evidence, full effect being given to the provisions of section 1235. (*People* v. *Green* (1971) 3 Cal.3d 981, 985 [92 Cal.Rptr. 494, 479 P.2d 998].) The limiting instruction was in fact more favorable to defendant than he would now be entitled to.

■ Defendant contends that the use of Swann's testimony from the preliminary hearing, including the prior inconsistent statement, violated

attacked and it is sought to rehabilitate the witness. (See Comment—Law Revision Commission, § 1236 West's Anno.Cal.Codes.)

"§ 1237. (a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:

(1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;

(2) Was made . . . (ii) by some other person for the purpose of recording the witness' statement at the time it was made;

(3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and

(4) Is offered after the writing is authenticated as an accurate record of the statement.

(b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party."

his confrontation rights under the Sixth Amendment to the United States Constitution. This issue has been settled by the United States Supreme Court in *California* v. *Green, supra,* 399 U.S. 149. It there held that the confrontation clause is not violated by California Evidence Code section 1235 permitting admission of a witness' prior inconsistent statement to prove the truth of matter asserted therein—wholly apart from the question whether defendant had an effective opportunity for confrontation at the trial—where the statement was given under circumstances closely approximating those that surround the typical trial. The United States Supreme Court noted that the witness was under oath at the preliminary hearing; that the defendant was represented by counsel; that he had every opportunity to cross-examine the witness as to his statement and to elicit explanations for the inaccuracies; and that the proceedings were conducted before a judicial tribunal, equipped to provide a judicial record of the hearings. These circumstances were present here and, as above noted, defense counsel thoroughly and extensively examined this witness.

The additional factor here, unavailability of the witness at the time of trial, comes within the long recognized exception that admitting the prior testimony of an unavailable witness does not violate the confrontation clause. (*California* v. *Green, supra,* 399 U.S. 149; *Barber* v. *Page* (1968) 390 U.S. 719, 725-726 [20 L.Ed.2d 255, 260-261, 88 S.Ct. 1318].)

■ Sections 1235, 1236 and 1237 of the Evidence Code are applicable in this proceeding; they are viable as written and do not violate the confrontation clause of the Sixth Amendment to the United States Constitution. (*California* v. *Green, supra,* 399 U.S. 149; *People* v. *Green, supra,* 3 Cal.3d 981; *People* v. *Gentry* (1969) 270 Cal.App.2d 462 [76 Cal.Rptr. 336] [§ 1237].)

■ *Fourth: Did the trial court err in failing to give instructions, sua sponte, on second degree murder?*

*No.* ■ The general rule is that the court must instruct the jury on the general principles of law relevant to the issues raised by the evidence, even though not requested to do so, but need not instruct on its own motion on specific points developed at the trial. (*People* v. *Hood* (1969) 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370].) As this court pointed out in *People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116], "On final analysis, the question before the court becomes that of determing whether, in relation to the case at bar, second degree murder is a 'general principle of law' or a 'specific point developed at the trial.' . . . The most rational interpretation of the phrase 'general principles of law governing the case' would seem to be as [*sic*] those principles of law commonly or closely and openly connected with the facts of the case before the

court." ▇ Here, as in *Wade,* the facts do not require or justify a finding of error for failure to instruct the jury on murder in the second degree.

The case was tried on the theory of first degree murder, and the court gave instructions thereon, including felony murder in the course of robbery and/or rape, and instructions on robbery, assault with intent to commit rape and assault. Section 189 of the Penal Code makes a homicide committed in the perpetration or attempt to perpetrate robbery or rape murder in the first degree. There was no substantial evidence that the homicide occurred other than during the perpetration or attempt to perpetrate robbery and/or rape. Defendant contends that the evidence "is *not* at all *irreconcilable* with the proposition that Mrs. Loya was *not* killed in the course of a rape or robbery" (italics his) but he makes no showing of any substantial evidence that would support an instruction on second degree murder. ▇ Instructions not justified by the facts of the case tend to overburden and confuse the jurors. (*People* v. *Wade, supra,* 53 Cal.2d 322, 333.)

The court must give any correct instructions on defendant's theory of the case which the evidence justifies, no matter how weak or unconvincing that evidence may be. (See Witkin, Cal. Criminal Procedure (1963) pp. 476-479.) ▇ The only defense evidence was alibi. The court instructed that if the jury had a reasonable doubt, after a consideration of all the evidence, that the defendant was present at the time the crime was committed, he was entitled to an acquittal.

The judgment is affirmed. The attempted appeal from the order denying a motion for new trial is dismissed.

Wright, C. J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.