[Crim. No. 21049. Nov. 15, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
BARRY FLOYD BRAESEKE, Defendant and Appellant.

692

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Clifton R. Jeffers, Chief Assistant State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Jack R. Winkler, Robert H. Philibosian, Chief Assistant Attorneys General, Edward P. O'Brien, Assistant Attorney General, John T. Murphy, Derald E. Granberg and Michael D. Whelan, Deputy Attorneys General, for Plaintiff and Respondent.

John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim and Arnold T. Guminski, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MANUEL, J.**—Defendant Barry Floyd Braeseke appeals from a judgment of conviction of three counts of first degree murder (Pen. Code, § 187). The issues presented involve the trial court's ruling on defendant's pretrial motion to suppress various statements made by him, including two confessions, and certain physical evidence. The trial court ruled that the first confession was inadmissible but that the rest of the evidence was admissible. Defendant contends the trial court erred in not suppressing the rest of the evidence on the ground that it was all a product of the first unlawfully obtained confession. The People, however, challenge the propriety of the ruling that the first confession was inadmissible, arguing that they are entitled to seek such review under Penal Code section 1252.[1]

On August 24, 1976, at approximately 1 a.m., defendant, who was then 20 years old, summoned Alameda County Sheriff's deputies to his home. There the deputies found the bodies of defendant's mother, father and grandfather; all were dead as the result of multiple gunshot wounds.

In response to questioning by the deputies, defendant said he had last seen his parents and grandfather alive at 9 p.m. when he left the house to go to a movie with his friend David Barker. The deputies noticed that although the master bedroom appeared to have been ransacked, there was no sign of forced entry; also, a number of items that would normally have been taken in a burglary were left untouched.

Defendant was taken to the sheriff's substation where he was interviewed by Sergeants Cervi and Seher shortly after 4 a.m. He related

---

[1]Unless otherwise indicated, all section references hereafter are to the Penal Code.

the same version of events he had earlier recounted. The interview ended about 5:15 a.m. Sergeants Cervi and Seher then discussed the case out of defendant's presence. They noted that defendant had blood splattered on his pants leg and that there were inconsistencies between defendant's story and that of his friend David Barker whom the officers had interviewed earlier. The officers therefore decided to conduct a further interview of defendant.

The second interview began about 6 a.m. It was not tape recorded, but defendant was fully advised of his *Miranda* rights. Defendant said he understood his rights and was willing to talk with the officers. When asked about the blood on his pants, defendant stated that it must have been acquired when he was checking the bodies. The officers replied that "splattered" blood would not be the result of having rubbed against a bloody object and that they believed defendant had committed the homicides. At this point defendant said he did not want to discuss the matter further without an attorney present. The questioning ceased, and Sergeant Cervi told defendant that if he wanted to talk at some later time he would have to contact the officers. Defendant was then arrested and booked.

During the booking procedure, Cervi asked defendant for his name, address and date of birth. When he asked defendant the name of his next of kin, defendant fell silent and asked if he could speak with Cervi alone and "off the record" (hereafter referred to as the "off the record statement"). Cervi agreed, and defendant began asking him hypothetical questions: "What if I tell you the rifle was somewhere where some kids may find it?" What would happen to him if he had done all the things the officers had accused him of doing? Cervi replied that he would appreciate any information defendant could give him but that defendant would have to go to jail. Defendant testified that Cervi also told him that "it would be better for [him]" if he gave a statement but that he would have to go to jail anyway.

Cervi then asked defendant, "[C]an I turn the tape recorder on; and can we get a statement from you to that effect?" Defendant said yes, and Cervi turned on the tape recorder at 7:25 a.m., from memory attempted to readmonish defendant of his *Miranda* rights, and recorded his statement (hereinafter referred to as Confession No. 1). In response to leading questions by Cervi, which omitted reference to the "off the record" request, defendant acknowledged that he had come forward during the booking procedure and asked to talk to Cervi about the inci-

dent. In response to further questions, defendant stated that he was acting voluntarily and was willing to waive his right to have an attorney present. Cervi concentrated on defendant's understanding of his right to counsel and neglected to include in his readmonishment the right to remain silent.[2]

During the formal statement defendant confessed that he and David Barker had murdered his mother, father and grandfather with a .22 caliber rifle. At the conclusion of the formal statement (Confession No. 1) defendant led the officers to the spot where he had hidden the rifle.

About 1 p.m. the same day defendant gave a tape-recorded statement to Deputy District Attorney Michael Cardoza (hereafter referred to as Confession No. 2). Cardoza began by advising defendant of his *Miranda* rights. Defendant said he understood them and was willing to talk. He confirmed the prior sequence of events and stated that he was aware of his *Miranda* rights and understood them at the time he asked to talk to Sergeant Cervi.[3] Defendant was again asked whether he was willing to waive his rights and talk; he said he was and again gave a full confession (Confession No. 2). This interview ended at 2:09 p.m.

---

[2]The transcript of that discussion reads in pertinent part as follows:
"Q. [Cervi] Barry, we have talked previous regarding the fatal shooting of your parents last night, uh, and we actually got to the point where you said you wanted to have a lawyer before you went any farther. Then, during the routine booking and filling out of the arrest form, you asked if you could speak to me; is that correct?
"A. Yeah.
"Q. And you—what I'm saying is that you came forward to me and asked if—asked to talk to me regarding the incident; is this correct?
"A. Yes.
"Q. And you're doing this of your own free will...
"A. Hell, yeah; yes.
"Q. ...being well aware of the fact that you still have the right to have a lawyer present.
"A. Yes, yes.
"Q. To have him pres-present for any and all questioning, and that if you...
"A. I understand that.
"Q. And that if you cannot afford to hire one, the courts will appoint one for you.
"A. Yeah, yes.
"Q. Okay, keeping all of this in mind, Barry, would you run down to me what did happen at your house tonight?
"A. I don't know how I can start.
"Q. Let's start with dinner...."
[3]The transcript of that colloquy reads as follows: "Q. [Cardoza] Now, what I'd like to talk to you about, Barry, is last night. Now earlier this morning, on August 24, 1976, you were in the Sheriff's Office, is that correct?
"A. Yes.
"Q. Prior to talking to the sheriff, you were read some rights, your Miranda rights, weren't you?

Defendant made a pretrial motion to suppress his off the record statement to Sergeant Cervi, the two tape-recorded confessions (Confessions No. 1 and 2), the rifle and various items of physical evidence which were allegedly products of the confessions. He also moved to suppress a statement made two days after his arrest on the ground that it too was a product of the earlier confessions. The trial court ruled that the confession to Cervi (Confession No. 1) must be suppressed because

---

"A. Yes.

"Q. All right, those were the same rights that I just read you, is that correct?

"A. Yes.

"Q. At the time that the sheriff read those rights to you, did you understand those rights?

"A. Yes.

"Q. Did he read them to you as I read them to you.

"A. Yes.

"Q. Did he explain them to you?

"A. He didn't need to—I understood them.

"Q. And—correct me if I'm wrong—at that time you told him that you didn't want to talk to him—you wanted your attorney present, is that correct?

"A. Yes.

"Q. And then a booking procedure started where you were being booked into jail, is that correct?

"A. Yes.

"Q. Prior to being booked into jail, that sheriff [*sic*] officer told you that if you wanted to talk about it some more you would have to re-initiate contact with him— that would mean that if you want to talk more, you'd have to tell him, I want to talk about it, is that correct?

"A. Yes.

"Q. Did you in fact tell him that you wanted to talk to him while you were being booked?

"A. Yes, I did.

"Q. No one forced you to do that, did they Barry?

"A. No.

"Q. Could you keep your voice up, please?

"A. All right.

"Q. How long after you were given the Miranda rights by that sheriff officer early this morning, did you ask to re-talk to the sheriff officer?

"A. About fifteen minutes to half an hour.

"Q. And you remembered these rights, didn't you? You still had those rights in mind?

"A. Yes.

"Q. And there was no confusion in your mind about these rights, was there?

"A. No.

"Q. No one forced you to talk to that sheriff, did they?

"A. No.

"Q. Do you know that sheriff's name that you asked to talk to again?

"A. I would remember, yes.

"Q. Do you know it now?

"A. No, I can't remember it right off hand.

"Q. All right, if we were to give you a name, do you think you would remember it?

"A. Yes.

it had not been preceded by an adequate *Miranda* warning.[4] (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) The rest of the items defendant sought to have suppressed were ruled admissible.

■  Since defendant's challenge to the latter ruling is premised on the validity of the ruling suppressing the initial confession, the first question we must decide is whether the People may obtain review of the ruling on the first confession under section 1252. Section 1252 provides in pertinent part: "On an appeal by a defendant, the appellate court shall, in addition to the issues raised by the defendant, consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General." This portion of section 1252 was enacted in 1927 as part of the statutory amendments

---

"Q. How does Serbe [Cervi] sound to you?
"A. That's it.
"Q. All right, you asked to talk to Sergeant Serbe [Cervi]?
"A. Yes.
"Q. And at the time you asked to talk to him, you remembered all these rights that he had given you earlier?
"A. Yes, sir.
"Q. No one forced you to talk to him, did they?
"A. No.
"Q. You wanted to do that?
"A. Yes.
"Q. And you wanted to give up your rights, is that correct?
"A. Yes.
"Q. At that time, prior to talking to Sergeant Serbe [Cervi], did you still understand the rights that he had read you approximately fifteen minutes to a half hour earlier?
"A. Yes, I did.
"Q. And did you have those rights in mind when you asked to talk to him?
"A. Yes.
"Q. And you did re-talk to him, didn't you?
"A. Yes, I did.
"Q. What you told him that time, was that the truth?
"A. Yes, it was.
"Q. OK, Barry. Now, again, I'm going to remind you of your rights, all right? Then I'm going to ask to talk to you about the incident. Would you be willing to talk to me about it?
"A. Yes...."

[4] In view of the pretrial ruling that defendant's second confession was admissible, defendant's trial counsel concluded that defendant's best defense was diminished capacity. He further concluded that defendant's first confession, which had been suppressed, would lend support to that defense since it contained references to defendant's use of the drug PCP. Accordingly, defense counsel stipulated to the admission at trial of the first confession on the condition that the stipulation would not constitute a waiver of defendant's right to challenge on appeal the rulings made at the suppression hearing.

proposed by the Commission for the Reform of Criminal Procedure. (Stats. 1927, ch. 620, § 2, p. 1048; see *The Association's Legislative Program* (1927) 1 State Bar J. 113.) In its report to the Legislature on the proposed amendments, the commission stated: "The additional provision that the appellate court shall pass upon rulings adverse to the state which it is requested to consider by the Attorney General is deemed an important one. At the present time the state has no way to review rulings adverse to it made during the trial. The proposed amendment will give this right, and thus a way will be opened to settle many disputed questions." (Rep. of Com. for Reform of Crim. Proc., Sen. J., p. 26 (1927).)

Despite the statute's broad language and stated purpose, defendant contends that section 1252 does not authorize review of the ruling on the first confession. He relies on *People* v. *Zelver* (1955) 135 Cal. App.2d 226 [287 P.2d 183]; *People* v. *Burke* (1956) 47 Cal.2d 45 [301 P.2d 241]; and *People* v. *Green* (1968) 264 Cal.App.2d 614 [70 Cal. Rptr. 647]. In *Zelver* defendant was charged with and convicted of three offenses. The trial court granted a new trial as to count II and then dismissed it on its own motion. Defendant appealed from the judgment of conviction on counts I and III; the People sought review under Penal Code section 1252 of the grant of a new trial and dismissal of count II. The Court of Appeal held that the People were not entitled to such review because the ruling was one from which they could have appealed under section 1238, but did not do so: "The statute here involved [section 1252] was intended to give the People the right, on an appeal by the defendant, when a judgment of conviction is reversed, to raise points that might be involved on a retrial. The statute was not designed to give the People a right in the nature of an appeal. The right of appeal is governed by other sections of the code." (*People* v. *Zelver, supra,* 135 Cal.App.2d at pp. 236-237.)

In *People* v. *Burke,* on defendant's appeal from a judgment of conviction, the People sought review under section 1252 of the trial court's order striking a prior conviction. We noted that the People could have appealed from the trial court's order but did not do so and relied on *People* v. *Zelver* in holding that section 1252 did not authorize review under such circumstances.

In *People* v. *Green,* defendant appealed from a judgment convicting him of two counts of receiving stolen property. The trial court had ruled that defendant's arrest was illegal. The Court of Appeal held that the

ruling that the arrest was illegal necessitated a determination that a search of defendant's room was likewise illegal because consent to the search was secured immediately after the illegal arrest and thus was inextricably bound up with it. Although the People attempted to argue on appeal that the search was valid because based upon a lawful arrest, the Court of Appeal, citing *Zelver*, held that it could not undertake such a review where the result would be affirmance of the judgment of conviction.

Both *Zelver* and *Burke* are distinguishable from the present case in that they involved attempts to raise issues which the People could have had reviewed by exercising their right of appeal. Although the *Green* case may not be so distinguished, it is, in our view, an unwarranted extension of the *Zelver* holding. Neither the language of section 1252 nor the statement of purpose by its drafters suggests that its scope was intended to be limited to authorizing review only when a judgment is being reversed.

The present situation is one which the Legislature may well have had in mind when it added this provision to section 1252. Since an appeal by the People is not authorized in this instance, an interpretation of section 1252 as precluding review of the order suppressing the initial confession would result in that order being binding on us even if clearly erroneous. Such a result would be patently unreasonable here where defendant's challenge to the admissibility of the subsequent confession and other evidence is premised on the validity of the ruling that the first confession was inadmissible. Thus, if the trial court erred in ruling that the first confession was inadmissible, it follows that the second confession was admissible and that the trial court's ruling to that effect was correct, even though based upon erroneous reasoning. To preclude the People from making this argument would be contrary to the rule that a correct decision of the trial court must be affirmed on appeal even if it is based on erroneous reasons. (See *People* v. *Grana* (1934) 1 Cal.2d 565, 571 [36 P.2d 375]; *People* v. *Towner* (1968) 259 Cal.App.2d 682, 685 [66 Cal.Rptr. 559]; *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117]; *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10]; Witkin, Cal. Criminal Procedure, Appeal, § 682, pp. 665-666; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 226, pp. 4215-4216.) To preclude review of an erroneous ruling on the admissibility of the first confession would also be contrary to the constitutional provision permitting judgments to be

reversed only when a miscarriage of justice has occurred. (Cal. Const., art. VI, § 13.)

Accordingly, we conclude that the People may, on an appeal by the defendant and pursuant to the provisions of section 1252, obtain review of allegedly erroneous rulings by the trial court in order to secure an affirmance of the judgment of conviction.[5] Our conclusion is consistent with the rule regarding review of points raised by the respondent in civil appeals. (See Code Civ. Proc., § 906; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 215-217, pp. 4205-4208; *Selected 1957 Code Legislation* (1957) 32 State Bar J. 556-557; see also Traynor, *Some Open Questions on the Work of State Appellate Courts* (1957) 24 U.Chi. L.Rev. 211, 220.) It is also consistent with the holding in the *Zelver* and *Burke* cases where review was denied because the People had an independent right of appeal which they failed to exercise and sought to raise error for purposes other than securing an affirmance of the judgment. We disapprove *People v. Green, supra,* 264 Cal.App.2d 614, to the extent it is inconsistent with this opinion.

■ We turn to the question of the correctness of the ruling that defendant's first confession was inadmissible. The People contend the trial court erred in excluding the confession on the ground that the *Miranda* warnings were inadequate. Defendant, on the other hand, contends that even if the trial court's reasoning on the *Miranda* warnings was incorrect, its ruling must nevertheless be upheld if there is any basis in the record to sustain it. (See *People v. Rios* (1976) 16 Cal.3d 351, 356 [128 Cal.Rptr. 5, 546 P.2d 293]; *People v. Towner, supra,* 259 Cal. App.2d at p. 685; Witkin, Cal. Criminal Procedure, Appeal, § 682, pp. 665-666.) On this record we agree with both contentions but, as we shall show, we conclude that the trial court's ruling on the first confession must be sustained because there is no evidence from which the trial court could have found beyond a reasonable doubt that the confession was the product of a knowing and intelligent waiver of defendant's *Miranda* rights. (See *People v. Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672].)

■ A *Miranda* warning is not required before each custodial interrogation; one warning, if adequately and reasonably contemporaneously

---

[5]The People may, of course, also obtain review of questions likely to arise on retrial when a judgment of conviction is reversed. (See *People v. Zelver, supra,* 135 Cal.App.2d at pp. 236-237; *People v. Burke, supra,* 47 Cal.2d at p. 54.)

given, is sufficient. (*People* v. *Johnson* (1969) 70 Cal.2d 469, 477 [74 Cal.Rptr. 889, 450 P.2d 265]; *People* v. *Bynum* (1971) 4 Cal.3d 589, 600 [94 Cal.Rptr. 241, 483 P.2d 1193].) Defendant was given proper *Miranda* warnings only an hour and a half before the incomplete read-monishment immediately preceding the confession. The warnings given appear sufficient. (See *People* v. *Duren* (1973) 9 Cal.3d 218, 241-242 [107 Cal.Rptr. 157, 507 P.2d 1365].) There remains, however, the question whether defendant knowingly and intelligently waived his *Miranda* rights.

■ It is beyond dispute that once a defendant has asserted his right to counsel the interrogation must cease. (*People* v. *Fioritto* (1968) 68 Cal.2d 714, 718-719 [68 Cal.Rptr. 817, 441 P.2d 625]; *People* v. *Pettingill* (1978) 21 Cal.3d 231, 237-241 [145 Cal.Rptr. 861, 578 P.2d 108].) It may not be resumed without counsel unless compelling evidence of a waiver of the suspect's rights appears. (Cf. *Miranda* v. *Arizona, supra,* 384 U.S. at p. 474 [16 L.Ed.2d at p. 723]; *People* v. *Randall* (1970) 1 Cal.3d 948, 956 [83 Cal.Rptr. 658, 464 P.2d 114].) Even when the defendant has not asserted his right to counsel, a "heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 475 [16 L.Ed.2d at p. 724].) When, as here, the defendant has asserted his right to the presence of an attorney that burden is particularly onerous (*People* v. *Randall, supra,* 1 Cal.3d at p. 958; cf. *People* v. *Brockman* (1969) 2 Cal.App.3d 1002, 1007-1008 [83 Cal.Rptr. 70]) and usually is discharged only by a showing that the defendant initiated without reservation the renewed interrogation. (See *People* v. *McDaniel* (1976) 16 Cal.3d 156, 172 [127 Cal.Rptr. 467, 545 P.2d 843]; *People* v. *Randall, supra,* 1 Cal.3d at p. 956.) ■ In the present case defendant did not unreservedly institute the renewed interrogation, and the People did not in any other way discharge the heavy burden imposed upon them by *Miranda*. A request to speak "off the record" cannot constitute a knowing and intelligent waiver of rights which include the advisement that "anything [a suspect] says can be used against him in a court of law." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 479 [16 L.Ed.2d at p. 726]; cf. *People* v. *Nudd* (1974) 12 Cal.3d 204, 207 [115 Cal.Rptr. 372, 524 P.2d 844]; *People* v. *Disbrow* (1976) 16 Cal.3d 101, 105-106 [127 Cal.Rptr. 360, 545 P.2d 272].) Indeed, defendant's request revealed a marked lack of

understanding of the *Miranda* warnings.[6] (Cf. *People* v. *Skinner* (1965) 235 Cal.App.2d 16 [44 Cal.Rptr. 883].) Sergeant Cervi then contributed to defendant's lack of understanding by agreeing to the request rather than informing defendant that there could be no such thing as an off the record discussion. (Cf. *People* v. *Honeycutt* (1977) 20 Cal.3d 150, 158-161 [141 Cal.Rptr. 698, 570 P.2d 1050].)

In view of the lack of any credible evidence that defendant's initiation of the conversation with Sergeant Cervi constituted a knowing and intelligent waiver of his *Miranda* rights, we must conclude that the continued interrogation of defendant was in violation of *Miranda* and that the confession resulting therefrom is inadmissible.[7] (See *People* v. *Pettingill, supra,* 21 Cal.3d at pp. 237-241; *People* v. *Disbrow, supra,* 16 Cal.3d at pp. 105-106; *People* v. *Randall, supra,* 1 Cal.3d at p. 958; *People* v. *Fioritto, supra,* 68 Cal.2d at p. 719.) The lack of a knowing and intelligent waiver by defendant of his *Miranda* rights makes the present situation similar to that in *People* v. *Pettingill, supra,* 21 Cal.3d 231, and the line of cases discussed therein where police improperly continued interrogating a suspect after he had invoked his rights under *Miranda.* As in those cases, it is immaterial that the continued interrogation was preceded by another advisement of *Miranda* rights. Nor do we believe that anything that occurred in the course of defendant's second confession, which clearly was a product of his first confession, can "cure" the defects in the method by which defendant's first confession was obtained.

Defendant contends that the trial court erred in not suppressing his subsequent statements and certain physical evidence as products of the first confession. ■ "The fruits of an illegally conducted interrogation are no less inadmissible during the trial of the declarant than his statements themselves." (*People* v. *Schader* (1969) 71 Cal.2d 761, 778 [80 Cal.Rptr. 1, 457 P.2d 841]; see also *People* v. *Buchanan* (1966) 63 Cal.2d 880, 887 [48 Cal.Rptr. 733, 409 P.2d 957].) Absent prosecution evidence showing a break in the causative chain between *seriatim* confessions, there is a presumption that the subsequent confessions were

---

[6]Thus, even if it be assumed that defendant was attempting to condition his discussion with Cervi, the assumption simply underscores defendant's lack of understanding rather than establishing the invalidity of the request.

[7]In light of this conclusion it is unnecessary to decide whether the first confession was also inadmissible because it was the product of a promise of leniency.

the product of the same improper police conduct which induced the first confession. (*People* v. *Spencer* (1967) 66 Cal.2d 158, 165-168 [57 Cal.Rptr. 163, 424 P.2d 715]; *People* v. *Johnson* (1969) 70 Cal.2d 541, 547 [75 Cal.Rptr. 401, 450 P.2d 865]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 574 [75 Cal.Rptr. 642, 451 P.2d 74]; *People* v. *McClary* (1977) 20 Cal.3d 218, 229-230 [142 Cal.Rptr. 163, 571 P.2d 620].)

The prosecution presented no evidence showing a break in the causative chain between defendant's first confession, the seizure of the rifle following that confession, the second confession the same day, and a statement by defendant two days later that he didn't mean to kill his family.

■ The improper introduction of a confession constitutes reversible error. (*People* v. *Pettingill, supra,* 21 Cal.3d 231; *People* v. *McClary, supra,* 20 Cal.3d at p. 230; *People* v. *Randall, supra,* 1 Cal.3d at p. 958; *People* v. *Fioritto, supra,* 68 Cal.2d at p. 720.) The judgment is reversed.

Bird, C. J., Tobriner, J., and Newman, J., concurred.

**CLARK, J.,** Dissenting.—How did the constable blunder? What did the officers do that they should not have done? What should have been done that was left undone?

The conduct of the police was irreproachable. Therefore, the lesson ("prophylactic effect") derived from today's decision can only be that this court no longer accepts convictions based on voluntary confessions.[1] This despite the fact that many convicted criminals (few criminals, of course, are convicted) would go free but for confessions. Worse, recognition that some desire to tell the truth–and should be permitted to do so—escapes the majority of our court.

---

[1]For recent cases manifesting our court's attitude toward confessions, see *People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672]; *In re Michael C.* (1978) 21 Cal.3d 471 [146 Cal.Rptr. 358, 579 P.2d 7], judgment reversed and cause remanded *sub nomine, Fare* v. *Michael C.* (1979) 442 U.S. 707 [61 L.Ed.2d 197, 99 S.Ct. 2560]; *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108].

There can be no doubt this 20-year-old defendant knowingly and intelligently waived his *Miranda* protections. As soon as the officers had reason to suspect defendant of the murders they fully advised him of his *Miranda* rights. He responded that he understood his rights and was willing to speak to the officers. When defendant subsequently invoked his rights and stated he did not wish to talk further without an attorney present, the officers immediately terminated the interview, told defendant they could not question him further, and advised he would have to reinitiate communication if he later wished to speak to them.

Defendant was then arrested. While being booked he asked to speak with Officer Cervi alone and "off the record." This request was granted and when alone, defendant asked Cervi certain hypothetical questions regarding what would happen if he were in fact responsible for the murders. Cervi told defendant he would have to go to jail, but that it would be better for him if he gave Cervi a statement. Cervi then asked defendant if he were willing to give a tape-recorded statement, and defendant agreed to do so. At commencement of the statement defendant was reminded he had previously refused to talk further without an attorney. Defendant acknowledged this was the case and also admitted he had subsequently asked to talk further with Cervi. Defendant also stated he was acting voluntarily and was still aware of his right to have an attorney present. Cervi did not readvise defendant of his right to remain silent or of the privilege against self-incrimination, but, as the majority concede (*ante,* pp. 701-702), repeating these rights was unnecessary in light of the complete admonition given him less than two hours earlier. Defendant then detailed his crimes.

A few hours later defendant gave a taped statement to a deputy district attorney. Defendant was again given the *Miranda* admonition and again stated he understood it and was willing to waive its protection. He acknowledged he had previously been advised of these rights, had understood them at that time, had stated he did not wish to talk without an attorney present and had then been advised that if he wanted to talk further, he would have to reinitiate discussion with the officers. Defendant affirmed he had later told Officer Cervi he wished to speak to him, that he had acted voluntarily in reinitiating communication with the officer, and he had done so with his *Miranda* rights in mind. Defendant was again asked whether he was willing to waive his *Miranda* rights, stated he was and again gave a full description of his crimes.

It would be difficult to imagine more compelling evidence of waiver of one's privilege to sit silent. Conversely, defendant's desire to describe his conduct to those charged with its solution is clear and should not be frustrated by our court.

Defendant's conviction for these grave crimes—cold-blooded murder of his father, mother and grandfather to secure his inheritance—should be affirmed.

Mosk, J., and Richardson, J., concurred.

Respondent's petition for a rehearing was denied December 28, 1979. Mosk, J., Clark, J., and Richardson, J., were of the opinion that the petition should be granted.