[Crim. No. 19753. Second Dist., Div. Five. June 13, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
BEN LEE BROWN, Defendant and Appellant.

## COUNSEL

Gilbert F. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Russell Iungerich and Daniel W. McGovern, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

COLE, J.*—Ben Lee Brown appeals his conviction of murder in the second degree arising out of the death of Jessie Houston. Defendant was previously convicted of this same offense in 1966, and the conviction was affirmed by division three of this court in 1967 in an unpublished opinion. The major contentions raised on this appeal were also raised then. Subsequently, the United States Court of Appeals for the Ninth Circuit entertained an appeal

---

*Assigned by the Chairman of the Judicial Council.

from a denial by the United States District Court of Brown's petition for a writ of habeas corpus. The federal Court of Appeals reversed the order of the United States District Court, first, ruling that at the original trial the requirements of *Jackson* v. *Denno,* 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205], concerning trial court resolution of the voluntariness of a "confession" did not appear on the record with the "unmistakable clarity" which is required. Secondly, the federal Court of Appeals was "gravely troubled" by what it termed the trial court's failure to make an adequate inquiry into the cause of defendant's expressed dissatisfaction with his counsel at the first trial, and his refusal to talk to or collaborate with his counsel. The federal proceedings are reported *sub nom., Brown* v. *Craven,* 424 F.2d 1166.

On this appeal, defendant raises four contentions:

"I. The trial court committed prejudicial error in refusing to instruct the jury on the Diminished Capacity evidence and the rebuttal of malice by evidence of intoxication.

"II. Appellant was deprived of effective assistance of counsel by failure to secure and present evidence of Diminished Capacity.

"III. The trial court erred in not conducting a hearing to determine what might be done to secure appellant's cooperation with appointed counsel.

"IV. The admission of appellant related to the jury by the arresting officer was elicited under compulsion in violation of appellant's constitutional rights."

We set forth only so many of the facts as are necessary to delineate the limited points raised.

### Facts

In the early morning hours of October 11, 1965, police were called, apparently by defendant and his 14-year-old son, to defendant's one-room, plus kitchen, apartment where the body of Jessie Houston, clad in a nightgown, was found in bed. The body was removed by coroner personnel for further examination. Defendant was not taken into custody. The investigating officer, Fallon, noticed what appeared to be burns around the legs and thighs of decedent. On October 11, defendant stated that the previous night (about 24 hours earlier) he had gone to bed with the deceased and that she woke him up about an hour later saying she had been burned. The bed was on fire and he threw some water on her. The next day he purchased

salve for her burns. There were tears in defendant's eyes as he talked to the officer.

Before testifying to the foregoing effect, Officer Fallon had testified similarly before the court, out of the presence of the jury, adding to his testimony then that defendant said that the victim had been high on narcotics and he had brought her home and that about two hours or so before the officers were there, his son had awakened him and told him that Miss Houston was not breathing.

Another police officer, Hambley, testified that on October 12, 1965, at about 10 o'clock in the morning, he was advised by radio to proceed to the apartment to make a further investigation because the coroner's report indicated that the deceased had suffered injuries of a traumatic nature. Officer Hambley testified, out of the presence of the jury, that he saw evidence of blood or a scuffle in the apartment; that he ascertained that defendant, defendant's son and the deceased had been the only persons present, and that he knew these matters before he asked defendant how the decedent was injured.

Hambley testified that at this point he was not absolutely certain that the defendant was a primary suspect.[1] When defendant told Hambley that he had slapped the victim the officer placed defendant under arrest and advised him of his constitutional rights.

The advice was concededly defective under *Miranda*[2] standards. Therefore, no attempt was made to introduce into evidence any statement of defendant to the officer subsequent to the time of arrest. However, Hambley was permitted to testify in front of the jury that when he told defendant that the coroner's office had advised that there were certain traumatic injuries on the deceased's body and asked the defendant if he had any knowledge of how she received those injuries that the defendant stated: "Yes. I slapped her."

---

[1]"A. My mind was opened [*sic*], and I was satisfied that he, by the questioning up to that point was certainly a material witness, if not a suspect, in the case. I felt satisfied that he knew what transpired there, and whether or not it implicated him as a participant or as a witness. I wasn't thoroughly satisfied until he told me that he slapped her. Then, I formed the opinion that he was now a suspect, a perpetrator of the crime rather than a witness."

[2]The case was first tried prior to the decision of the United States Supreme Court in *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. However, in California, *Miranda* standards must be applied in subsequent retrials of cases first tried prior to *Miranda*. (*People* v. *Doherty*, 67 Cal.2d 9, 20 [59 Cal.Rptr. 857, 429 P.2d 177]; cf. *Jenkins* v. *Delaware*, 395 U.S. 213 [23 L.Ed.2d 253, 89 S.Ct. 1677].)

At the time this statement was made by defendant the officer smelled an alcoholic odor and was of the opinion that defendant had been drinking but was not under the influence of alcohol. The trial court, after hearing this testimony, found the statement to be voluntary and further not to be the product of custodial interrogation.

The coroner testified that the cause of death was due to blows to the head applied by a blunt force. He also described detailed deep puncture wounds around the deceased's buttocks area which could have been caused by the spike heels on women's shoes. As to the burning about the decedent's legs and thighs, this, in the coroner's opinion, had been suffered when the decedent was either dying or dead.

The only defense testimony presented was that of defendant's son. His testimony was impeached in material respects. His testimony was that the victim on the night of her death appeared to be high; that she went into the kitchen and on coming out, fell, hitting her head on a coffee table; that the victim then lit a cigarette and went to bed, smoking; and that he, the witness, fell asleep. He testified that when he woke up the mattress appeared to be burnt; that he told his father, the defendant about it; that the latter put his ear to the decedent's heart and said she was alive and that he, the witness, fell asleep again. When he woke up again he noticed that the victim had stopped breathing and told his father, who started crying. His father got dressed and he and his father went to call the police and an ambulance.

We turn now to defendant's contentions.

### Instructions About Intoxication

Defendant's argument that the trial court committed error in refusing to give various instructions dealing with appellant's intoxication and mental condition as it affected his capacity to harbor malice is without merit. This is for the simple reason that there was no evidence that defendant was intoxicated. It is, of course, error to instruct the jury on matters or issues not before it. Conversely, the court must give any correct instructions on defendant's theory of the case *which the evidence justifies* no matter how weak or unconvincing that evidence may be. (*People v. Bynum*, 4 Cal.3d 589, 604 [94 Cal.Rptr. 241, 483 P.2d 1193].)

Here, it is true that at the conference with the trial court, *out of the presence of the jury*, and at a very early stage in the trial, counsel for defendant stated that he had definite information that diminished capacity would be part of the defense and that there was drinking on the part of defendant. He stated that he intended to follow this up to the best of his

ability, and "I will have to see what evidence I will be able to bring in, whether or not it will be brought in by my client or not." Again, out of the presence of the jury, and in connection with a hearing on the question of the voluntariness of his statement to the officers, defendant testified that he had been drinking. (The transcript is considerably confused as to whether this testimony relates to the evening immediately preceding the death of decedent or the evening before that.) The transcript does support the inference from defendant's testimony that he had a hangover from drinking when Officer Hambley arrived on October 12. However, as indicated, defendant's testimony was presented only to the court and not to the jury. Defendant did not take the stand before the jury.

The only evidence at all relating to defendant's drinking which was heard by the jury is the testimony of Officer Hambley that on October 12, 1965, defendant's breath had a stale alcoholic odor and that defendant stated that the preceding night (in other words, the evening of October 11, more than 12 hours *after* decedent's body had been delivered to the coroner) he "had had a few or imbibed or something of that nature." The latter evidence might have raised a question for the jury as to defendant's sobriety on the morning of October 12. But there is no evidence to affect his sobriety or put in issue his mental condition the day decedent met her death.

Even if we are to assume that there was evidence that the defendant had been drinking, such conduct prior to the commission of a crime does not by itself establish intoxication or require the giving of a requested instruction on the subject of intoxication. (*People* v. *Turville,* 51 Cal.2d 620, 633 [335 P.2d 678]; *People* v. *Cram,* 12 Cal.App.3d 37, 44 [90 Cal.Rptr. 393].)

### Contentions Concerning Defendant's Trial Counsel

Because they have some relationship to each other it is convenient to consider together, and in reverse order from that presented in defendant's brief, the contentions that the trial court erred in not having a hearing to determine what might be done to secure defendant's cooperation with appointed counsel and that such counsel failed to give effective assistance to defendant since he did not secure and present evidence of diminished capacity.

In reversing the judgment denying the writ of habeas corpus, the United States Court of Appeals ruled that at the first trial the superior court did not make "adequate inquiry into the cause of Brown's dissatisfaction with his counsel or [take] any other steps which might possibly lead to the ap-

pointment of substitute counsel in whom Brown could repose his confidence. The result was that Brown was forced into a trial with the assistance of a particular lawyer with whom he was dissatisfied, with whom he would not cooperate, and with whom he would not, in any manner whatsoever, communicate. . . . Of course, a court is not required to provide an indigent accused with any particular attorney whom he may desire, and we think that the state court might very properly have required Brown to accept the assistance of some other of the great number of competent attorneys associated with the Public Defender's office of Los Angeles County. The problem arises because the state court did not, in our opinion, take the necessary time and conduct such necessary inquiry as might have eased Brown's dissatisfaction, distrust and concern. And, we think it not unreasonable to believe that had Brown been represented by counsel in whom he had confidence he would have been convicted, if at all, of no more than the offense of manslaughter." (*Brown* v. *Craven*, 424 F.2d 1166, 1169-1170.)

■ We recognize as the law applicable in this situation, a statement of our Supreme Court in *People* v. *Marsden,* 2 Cal.3d 118, 123 [84 Cal. Rptr. 156, 465 P.2d 44], quoting from *People* v. *Mitchell,* 185 Cal.App.2d 507, 512 [8 Cal.Rptr. 319]: " 'A defendant's right to a court-appointed counsel does not include the right to require the court to appoint more than one counsel, except in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused. . . . ■ "The right of a defendant in a criminal case to have the assistance of counsel for his defense . . . may include the right to have counsel appointed by the court . . . discharged or other counsel substituted, if it is shown . . . that failure to do so would substantially impair or deny the right . . . , but the right to such discharge or substitution is not absolute, in the sense that the court is bound to accede to its assertion without a sufficient showing . . . that the right to the assistance of counsel would be substantially impaired . . . in case the request is not granted, and within these limits there is a field of discretion for the court." [Citations.]' "

The Supreme Court continued (2 Cal.3d at. pp. 123-124): "Defendant properly contends that the trial court cannot thoughtfully exercise its discretion in this matter without listening to his reasons for requesting a change of attorneys. A trial judge is unable to intelligently deal with a defendant's request for substitution of attorneys unless he is cognizant of the grounds which prompted the request. The defendant may have knowledge of conduct and events relevant to the diligence and competence of his attorney which are not apparent to the trial judge from observations within the four corners of the courtroom. Indeed, '[w]hen inadequate representation is

alleged, the critical factual inquiry ordinarily relates to matters outside the trial record: whether the defendant had a defense which was not presented; whether trial counsel consulted sufficiently with the accused, and adequately investigated the facts and the law; whether the omissions charged to trial counsel resulted from inadequate preparation rather than from unwise choice of trial tactics and strategy.' [Citation.] ▮ Thus, a judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney. A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention 'is lacking in all the attributes of a judicial determination.' [Citation.]"

▮ In fairness to the previous state courts which ruled on this matter, we think it must be pointed out from the record of the first trial, of which we take judicial notice, that defendant manifested an obdurate refusal to cooperate with counsel in his first trial; that the trial court there conducted a colloquy with him extending over seven pages of the reporter's transcript and that defendant's statement of reasons for requesting a change of attorneys was: "My personal feelings is my case. I don't have any personal feelings against this gentleman. I just don't want to have him for my lawyer. You just try me under duress without an attorney." The previous trial court gave more than thoughtful attention to defendant's contentions.

Given the broad clue appearing from the language of the United States Court of Appeals, quoted above, it is predictable that in his second trial of the matter defendant should have acted in the manner which we are about to recite. However, it is evident that defendant was so enamored of the federal suggestion that if he was represented by an attorney in whom he had confidence it was likely that he would be convicted only of manslaughter at best, that he determined not to have confidence in anyone. It is also evident from some of his comments that he was under the erroneous opinion that he could only be convicted of manslaughter. It is also obvious that he failed to heed the concluding words of the opinion of the federal court reversing the United States District Court's denial of a writ of habeas corpus: "Upon remand, the District Court may temporarily hold Brown's petition in abeyance and shall grant the petition unless California authorities do, within a reasonable period, not exceeding sixty days, grant Brown a new trial attended with all reasonable assurance that he be represented by competent counsel, from the Public Defender's office or elsewhere, in whom he may, *if he does not demonstrate obstinance, recalcitrance, or unreasonable contumacy,* repose his confidence." (Italics added; 424 F.2d at p. 1170.) It is clear to us that defendant did demonstrate each of these undesirable traits as illustrated by the matters occurring which we now outline.

1. Although it was not necessarily required so to do, the superior court on August 13, 1970, granted the motion of the public defender under then Penal Code section 987a to relieve the public defender's office "for other reasons" as provided in that section. The public defender stated only that it was in the interest of defendant for the public defender to be relieved. When the court asked for further explanation, insofar as the record shows, counsel stated only that the motion was the basis of his considered judgment and that to go further into the matter might be prejudicial to the defendant. The court conferred off the record with the deputy district attorney and the deputy public defender, and announced that it was persuaded that the motion was well taken and would be granted. *The court then asked the defendant the name of the lawyer that he wanted appointed, and defendant named counsel who had represented him in his prior state court appeal. That counsel was appointed and represented defendant thereafter throughout his trial.*

2. Actual trial of this matter took place over a span of seven court days, from October 27 through November 6, 1970. At the start of the trial, counsel announced that defendant was ready and defendant stated: "I got a witness, my son, and I don't see him, your Honor." Counsel advised that he had been unable to get in touch with the son but he and defendant could take care of this between them. The son did, in fact, testify as indicated above.

3. Defendant then attempted individually to waive a jury trial but both his counsel and the People refused the waiver. After the noon recess, the court again took up with defendant and his counsel, in chambers, the question of a jury trial. Counsel stated that he was convinced that it would not be wise for defendant to waive a jury trial. Defendant first said he had discussed nothing about this with his counsel but then said that counsel had so advised him previously.[3]

---

[3]The following colloquy then took place: "The Defendant: . . . me and my attorney haven't been getting along. I done put in a 487a to dismiss [defense counsel]. I have got them all denied. [Defense counsel] argued almost two hours with [district attorney] on that 60-day denial, and he never rejected to nothing [the district attorney] said. So, that is the reason that I didn't want no—I haven't got a chance with a jury if I got an attorney going to let the District Attorney do all of the talking, Judge. If I am going to be sold out, I rather to do it with somebody has got a law practice, and I rather take my chance if you—if I am going to get railroaded back to the joint, I'd rather be sent by somebody who—who sends me that knows the law. *I haven't been satisfied with counsel that—since I have this case, 1965.*

"The Court: Well, there is no motion before me pending in that regard, and I intend to go ahead. I see no reason why this attorney should not proceed with the matter. He is well acquainted with it. I take it from the file you have been with him for some time?

4. In a chambers' session on the third day of trial, after a discussion concerning the diminished capacity defense (which we will come to shortly), the court made certain inquiries of defendant.[4]

"[DEFENSE COUNSEL]: Yes.

"THE COURT: You have worked on the appeal?

"[DEFENSE COUNSEL]: I first looked at the case in 1966. I reviewed the reporter's transcript and the clerk's transcript. I prepared about two or three rough drafts of an appellate opening brief. If Your Honor please, I, then, made a final draft and presented that to the Appellate Court. I have since been appointed to the case in August of this year, spent approximately 14 to 15 hours now preparing for the case, and that includes about five or six hours with the defendant himself. I have reviewed again the reporter's transcript. I have outlined the case in my mind, and on paper, and I have researched the applicable points of law.

"THE COURT: Mr. Brown, for me to discharge this attorney and appoint another one would mean a long delay in the case.

"THE DEFENDANT: This has been happening to me, Your Honor, for pretty close to five months since I have been back. I see what is happening to me. So, I am ready to go back to the pen because I see that is where I am going. So, I would— I have been coming on that lane for almost three weeks waiting. I am only going back to the joint.

"THE COURT: Not because your counsel is willing that you go because I will insist that he do all that is necessary to defend you.

"THE DEFENDANT: *I think that my counsel is helping me, Your Honor—*

"THE COURT: He cannot fight facts or the evidence. He can do the best that he can do with what evidence is available, and I will see that he does that.

"THE DEFENDANT: I hope that you do, sir." (Italics added.)

Thereafter, the court from time to time did inquire of counsel as to certain defenses, and in that manner did see that counsel did the best he could with what evidence was available.

[4]"THE COURT: All right. Did you have something that you want to say, Mr. Brown? Is there any reason why we should not proceed with the matter?

"THE DEFENDANT: It is just because Judge Ely, in the first place or not—I have not been represented properly since I had this case like I actually—Monday or Thursday—when I come in here—I would rather have a jury trial because, you know, right from wrong, and it is going to be no—who—who represented most to those people sitting out there. They don't know the right—they don't know why I am back here. [District attorney]—he already—Mr. Noguchi laid the foundation out there and those people's minds no doubt—I know if I was sitting there and the jury's mind when [district attorney] got there and said about Jessie being burned—He did not bring out in the last part that I doctored on Jessie. He did not bring out that I had two witnesses know Jessie was living.

"THE COURT: What makes you think that your counsel won't bring those witnesses out?

"THE DEFENDANT: Because I haven't got no witness. If I had a good counsel, I would have been on the street.

"THE COURT: Well, have you discussed this with [defense counsel]?

"THE DEFENDANT: Sure. I asked him to find a witness on 60 days when I got denied that.

"THE COURT: You are talking about something else now. We are talking about getting witnesses. Did you give the names of those two witnesses to [defense counsel]?

"THE DEFENDANT: I gave him the name of my son who woke me up and told me Jessie had stopped snoring. There is no/way that I can prove what this man have said is wrong without somebody saying that they saw Jessie living that day.

"THE COURT: Who did that? Your son?

5. The next reference to the relationship between defendant and counsel,

"THE DEFENDANT: My son saw.

"THE COURT: Is the son going to be called?"

A colloquy then followed about whether the son had been or would be served as a witness. After which the following occurred:

"THE COURT: Who is the other witness?

"THE DEFENDANT: Mary Clay. Mary Clay. The salve on the girl's body?

"THE COURT: The salve?

"THE DEFENDANT: Bought the—salves that you rub.

"[DISTRICT ATTORNEY]: Unguentine.

"THE DEFENDANT: That Mary brought and I rubbed it on her burns. Dr. Noguchi —he did not bring this up yesterday. He showed where the girl was dead. I kind of burned her up from the way that he says—she was dead before. Burned her after she was dead or something or another. They are speaking about somebody that I love just as much as I did myself.

"THE COURT: We are talking about witnesses.

"[DEFENSE COUNSEL]: While we are on the record, I interrogated my client five times and asked him for the names of witnesses, and was told that there were no witnesses. I said, 'How about Bobby Brown, your son? He said he wasn't there, but, 'He woke me up and told me that the woman wasn't breathing anymore.' Now, I'm going to try my best to get Bobby Brown here, but as my legal knowledge tells me, that is not the most material witness as to what happened.

"THE COURT: Well, he is a material witness?

"[DEFENSE COUNSEL]: He is a material witness, but I think that you can understand that I haven't defaulted in calling any witnesses because I don't know of any.

"THE COURT: Well, Counsel, I do feel that he should be here. That from what is stated in Judge Ely's opinion, and from what the defendant now tells me, he would be a material witness as to the condition of the parties at the time.

"[DEFENSE COUNSEL]: I have sent a letter and a telegram, and will now send a subpoena.

"[DISTRICT ATTORNEY]: I know where he is.

"[DEFENSE COUNSEL]: All I am saying is I tried already to get him here, and I will try some more.

"THE DEFENDANT: He is in San Bernardino.

"THE COURT: Now, this other witness, if she was present when the defendant was putting salve on the victim, this certainly goes to his state of mind.

"[DISTRICT ATTORNEY]: I don't think that she can be located.

"THE COURT: Well, that is a different problem. What I am suggesting is that she is material, and I think that the defendant is entitled to have every reasonable effort made to see that she is here, and if counsel hasn't even discovered the name of the witness, then, there is a failure of communication here between the defendant and counsel.

"[DEFENSE COUNSEL]: You mean Mary Clay?

"THE COURT: Yes. If I understood you to say that you talked to him many times, and he has not even disclosed this name to you before—(interrupted).

"[DEFENSE COUNSEL]: That is right. Mary Clay came up in the first trial in the reporter's transcript. I believe she did appear, did she not, once?

"[DISTRICT ATTORNEY]: I think she did appear at the preliminary, possibly. No. No. She didn't, and I don't think that she testified at the trial. I don't think she testified there.

"THE COURT: Well, the defendant is entitled to a vigorous defense, and the very best that is possible and that can be done for him. I would expect that to be done. We will go ahead with the matter, and we will recess to the court and proceed with the jury trial."

eliminating interim reports on counsel's efforts to locate defendant's son as a witness, occurred on the fourth day of the trial.[5]

6. While counsel had indicated that he could keep his client under control, the control did not last any longer than the start of proceedings the next day.[6]

---

[5] "[DEFENSE COUNSEL]: My client has begun a discussion with me about the fact that they are using the same evidence as before and asked me to tell things to the jury, and I do not quite understand what his problem is, but it has upset him.
"THE COURT: Well—(interrupted).
"[DEFENSE COUNSEL]: I don't know what can be done. I will try to proceed.
"THE COURT: You are running the case. You are in charge. You will have to keep him under control.
"[DEFENSE COUNSEL]: I will.
"[DISTRICT ATTORNEY]: The only problem is that his client is making statements that I can hear with clarity where I am seated, and if his client wants to take the witness stand, that is fine, but I do not want him testifying from his seat.
"[DEFENSE COUNSEL]: Yes. I will control my client.
"THE COURT: All right."

[6] "THE COURT: We will proceed again in the case of People versus Ben Lee Brown.
"[DEFENSE COUNSEL]: I am not ready.
"THE DEFENDANT: I am not ready.
"[DEFENSE COUNSEL]: I am not ready.
"THE DEFENDANT: The defendant is not ready.
"THE COURT: Let the record show that the defendant is present with his counsel. The jurors are absent from the courtroom.
"THE DEFENDANT: And the defendant is not ready. My counsel is not here.
"THE COURT: You have a name on this piece of paper, Morris Lavine?
"THE DEFENDANT: Right.
"THE COURT: Have you conferred with Mr. Lavine?
"THE DEFENDANT: Friday. I was trying to get in touch with him today. So, my counsel is not here.
"THE COURT: Well, you do have counsel.
"THE DEFENDANT: No, sir. I doesn't have counsel, Judge Sprankle.
"THE COURT: Well, this attorney has been appointed by the Court. He has been representing you up until now.
"THE DEFENDANT: The attorney has been appointed by the Court, but he has not been representing me, however. I am trying to get my own attorney—you all won't— so, I am trying to pay and get my own.
"THE COURT: When Mr. Lavine appears in court, I will hear from him.
"THE DEFENDANT: I am not going to go to court with this guy, Judge.
"THE COURT: We will proceed and I will ask the jury to come in.
"THE DEFENDANT: Take me back.
"THE COURT: Just sit down, Mr. Brown.
"THE DEFENDANT: I am not going to stand up and send me to the pen.
"THE COURT: Mr. Brown, I only have two choices.
"THE DEFENDANT: Whatever you do, it isn't—going to be better than going to the pen. Whatever you want to do to me, and you using it on me, whatever you do it is all right with me. I am not going to court with this guy.
"THE COURT: Mr. Brown, I will let you have a choice: either sit down and watch the proceedings or stay in the anteroom until you want to behave. Whichever you wish.
"[DEFENSE COUNSEL]: The record might reflect that the defendant has left the courtroom.

Thereafter, the court having been forced to conduct the trial in defendant's absence, defendant apparently remained outside of the courtroom through the remainder of the trial except when he was brought into the court in the absence of the jury.

7. At the start of the trial session in the afternoon of the same day that defendant refused the opportunity to be present, this colloquy occurred.[7] After defendant left the courtroom again, as indicated in the

"THE COURT: Yes. On his own volition. We will proceed, and I will ask the jurors to come in.

" . . . . . . . . . . . . . . . .

"THE COURT: Mr. Brown, counsel are ready to proceed. Your counsel would prefer that you be here. Just listen to me for a moment. I understand that you may want Mr. Lavine to be substituted in for you. I would suggest to you that you come over here and sit down and listen to me for just a moment. I will hear from you, then.

"THE DEFENDANT: Yes.

"THE COURT: Just come over here and sit down and listen. Do not say anything. You can disagree, you can quarrel with your counsel, but when Mr. Lavine comes, you will be able to explain to him what happened. If you are in the other room, you will not know what is going on. We do not have any facilities to let you know what is going on in the courtroom.

"THE DEFENDANT: Yes. I am not going to sit up there, Judge, and let you—this guy and this man send me back to the penitentiary. You will have to kill me. Do you understand, Judge? I know this guy and this guy—don't haul me—haul me all over this County to different courtrooms. He is speaking in the courtroom to try me—this man ain't filed nothing at all—I forfeit 4½ years trying to get to the Ninth Circuit. He didn't get it. I got me—me and other convicts—and I am not going to sit here and listen to this guy use the same evidence over on me again. I am not going to let [defense counsel] and [district attorney] send me back to the penitentiary. You can put me wherever you want, but I am not going to sit there. I will be in the back. If you want to try me without a lawyer, I ain't got one now. *I had a P.D. —done pretty good for me.* This guy had him shot away and not this tricker. I have been trying to get rid of him ever since the 15th of September. So, whatever you do, Judge—you know I ain't had no right. I will not give equal with nobody.

"THE COURT: Do you want to sit down now?

"THE DEFENDANT: No, sir. I am sitting here.

"[DISTRICT ATTORNEY]: I understand, Mr. Brown, you refuse to sit down?

"THE DEFENDANT: You know where you can go, f - - - - r.

"THE COURT: I see no alternative to an orderly trial than to proceed in the absence of the defendant. The defendant has been given every opportunity to be present. He has a qualified and capable counsel, and we will proceed with the matter. I will hear the People's motion." (Italics added.)

The Mr. Lavine mentioned in the foregoing quotations never appeared in the trial.

No point is made of defendant's absence from the courtroom nor, under the circumstances, could any such point be made. (*Illinois* v. *Allen,* 397 U.S. 337 [25 L.Ed.2d 353, 90 S.Ct. 1057].)

[7]"THE COURT: In the matter of People versus Ben Lee Brown, let the record show that the defendant is now in the courtroom and in the absence of the jury. Mr. Brown, I want to explain to you, that you have the opportunity to be present with your counsel as we proceed.

"THE DEFENDANT: I have no counsel, Your Honor. Let the record show I have no counsel.

footnote, counsel made and the court denied a motion for judgment of acquittal. Counsel was then excused to have an opportunity to confer with defendant and later trial resumed again in defendant's absence.

8. Toward the end of the afternoon session, defense counsel made the following statement on the record: "[DEFENSE COUNSEL]: If Your Honor please, I wish to advise the Court that today at 2:20 I personally spoke with the defendant, Ben Brown, and inquired whether he wished to take the stand and testify on his own behalf in this matter. I advised him that it was his decision to make. I pointed out to him further that in my judgment in some cases some juries take a dim view of the defendant who does not take the stand. I further pointed out to him that if he did take the witness stand he would be subjecting himself to cross-examination. The defendant did not reply. Therefore, the defendant will not take the stand at this time.

"THE COURT: Is this your advice to him, that he not take the stand.

"[DEFENSE COUNSEL]: Yes.

"THE COURT: All right. Then you are ready to rest?

"[DEFENSE COUNSEL]: Yes."

Court then recessed until the following afternoon when the defendant was again brought into court in the absence of the jury.[8]

---

"THE COURT: Well, despite your statement, you do have a counsel. We are proceeding with the trial and I invite you to be present if you want. We are going to proceed. Let the record show that the defendant has voluntarily walked out of the courtroom into the lockup room."

[8]"THE COURT: In the matter of People versus Ben Lee Brown, let the record show that the defendant is in the court.
"THE DEFENDANT: I haven't got a counsel.
"THE COURT: His counsel and the Deputy District Attorney are present. All of the jurors are absent from the courtroom.
"THE DEFENDANT: I haven't got a counsel.
"THE COURT: All right. Your statement is now of record, and anybody who reads it will understand your position.
"THE DEFENDANT: Will you let me make this statement?
"THE COURT: Yes, sir.
"THE DEFENDANT: Since I am speaking for myself since—under 24323 I got a reversal at the Ninth Circuit—April 16, 1970. The Judge Ely said only if I was to be tried and found guilty—the only thing that the case would ever be would be manslaughter if and at all were competent counsel. So, therefore, I ain't got no counsel or being tried for second degree murder. Something I got almost six years in on. This man here, . . . , the District Attorney, and he, [Defense Counsel], have plotted and sent me back to the penitentiary, Your Honor. I ask you for Court trial, for a Court trial because I didn't know that I could waive a jury. You told me that

it is best to have a jury. This guy [Defense Counsel], this guy—this [District Attorney] here and my lawyer suppose have been my lawyer said that was true. You could have tried me because you know law, Judge Sprankle, Your Honor, because I didn't know anything about law. You all have plotted and used me and for—I got just nowhere in this court since I have been back from the penitentiary, and furthermore, Your Honor, you were supposed to take care of my rights. You haven't done that. You haven't done that, Judge. You haven't done that, and yesterday you carry my trial on all day long while I was in the jury room.

"THE COURT: You were invited to be here.

"THE DEFENDANT: I was invited out here. This man got police I never seen in my life. They have never seen me in my life. Bringing in evidence and testimony for a victim I have not killed—the President of the United States—I haven't done killed nobody. Why would the frame be on me? Why would they frame me like this? I have been in that stinky hole in the pen for almost six years for something I ain't done on account of my illiterate and stupid no-good to take care of myself in law— I had that fellow even there to take care of me, and they—he is plotting with this fellow, this thing sitting right here, Your Honor, and they done got together and wired my case back up to send me back to the penitentiary, and I haven't killed nobody, not a soul.

"THE COURT: All right. Now, Mr. Brown, there is a lot of untruth to what you have just said. I have seen no conspiracy between counsel. Your counsel has acted diligently and hard in your absence and has done everything that he can think of to favor your side of the case. The reason that I called you out here was to make sure that you understand your rights and to let you know that I am trying to protect your rights to the very best of my ability. Now, one of the things that you have a right to do is to take the stand on your own behalf. In your absence, your counsel has rested his case because he did not have you here as a witness. He advised me that he had conferred with you and that together you had concluded it was in your best interest not to take the stand, which is your right, but I want it clearly understood that if you want to defend yourself, if you want to tell the jury just what you told me, that part is material and you can tell them. You can take the stand under oath. Your counsel, however, would advise you against it, and I cannot quarrel with his judgment having seen your previous attitude and demeanor while on the stand, and also your statement, but the statement you made to me is entirely different than that now before the jury, and I cannot present those matters to the jury in the absence of your testifying and in the absence of you being here in the court. According to the situation, as it now stands, you may very well be convicted of second degree murder rather than, as Judge Ely has suggested with competent counsel, and he assumed with your help and assistance, might be manslaughter. You have absented yourself from the courtroom. You have refused to cooperate with him. I invite you again to stay here and to assist your counsel and be present during the instructions and the argument.

"THE DEFENDANT: How come you don't give me a Judge trial?

"THE COURT: That is beside the point. I cannot unless the People waive it.

"THE DEFENDANT: What People? The People is not on trial. I is on trial.

"THE COURT: I do not propose to argue the matter with you.

"THE DEFENDANT: I am not arguing. I am sorry. I am not arguing with you. You be the best man because you are my only hope so my voice is all I have.

"THE COURT: All right. Just let me tell you the law prohibits me from giving you a Court trial, unless the People join in the waiver, and they have not seen fit to join. Besides that, your own counsel does not think that you should, and I think that he is using good judgment.

"THE DEFENDANT: I haven't got a counsel. This guy is working with the District Attorney here. I have been trying to get rid of this man, Judge Sprankle, ever since the 15th of September. Why couldn't I get rid of him?

"THE COURT: You cannot.

"THE DEFENDANT: I cannot?

9. At time of sentencing defendant presisted in his objections to counsel.[9]

"THE COURT: Now, do you want to sit here with your counsel?

"THE DEFENDANT: For what? Ain't going—nothing going—to me back to the penitentiary but the lights on the bus.

"THE COURT: Do you want to be in court or not?

"THE DEFENDANT: I haven't got a counsel, and I want the Court—if you think my voice hostile this is just the way that I talk. I am not hostile, but I know I'm going back to the pen. So, I'm going back in there and play some coon can.

"THE COURT: All right. We will proceed and call the jury."

[9] "THE COURT: Is there anything further that you want to say about the matter, Mr. Brown?

"THE DEFENDANT: I would like to have my lawyer that I gave [defense counsel] to try to do something also. I gave him some law back in July, back in August.

"[DEFENSE COUNSEL]: Yes.

"THE DEFENDANT: And I would appreciate the Court, or would you give him my paper or would you write to the Bar?

"[DEFENSE COUNSEL]: I have all of the documents set aside here that I received from Mr. Brown, and I am going to hand them to him.

"THE DEFENDANT: Well, I appreciate that, and [defense counsel]—further get just what I just got, Judge Sprankle, and I got crossed, and I—like I told you I was going back to the joint. I asked you to allow me because I didn't have a chance with a jury in the first place.

"THE COURT: You did not have a chance with a Judge, either.

"THE DEFENDANT: I would have rather for you to judge me.

"THE COURT: All right.

"THE DEFENDANT: You know.

"THE COURT: Well—(interrupted).

"THE DEFENDANT: The People wasn't on trial. They haven't done five or six years.

"THE COURT: Well, Mr. Brown—(interrupted).

"THE DEFENDANT: I am just back in the pen. I appreciate tears, and I am going to the gas chamber, I got it.

"THE COURT: You are not going to the gas chamber, and if you behave yourself you will be eligible for a parole very quickly. A lot of this is going to depend upon your attitude and your demeanor, and our ability to communicate with you here has not been very good. If I were judging the matter, I would have done the same thing. Had you listened to your counsel, however, matters might have been entirely different. He had a proposal that was acceptable to the District Attorney. Had the District Attorney accepted it with your compliance, the situation might have been entirely different.

"THE DEFENDANT: Judge Sprankle, I asked [Defense Counsel] to file a writ of habeas corpus that I got denied on the 60 days. He did not file that. I asked him to file a 1538.5.

"THE COURT: That is what I am telling you, Mr. Brown.

"THE DEFENDANT: I am not—

"THE COURT: He has done a lot for you. You would not let him do it for you.

"THE DEFENDANT: He sure is.

"THE COURT: Are you telling him how to run his case? That is exactly what you are doing right now. You are telling him what to do.

"THE DEFENDANT: He got me to the joint back after five years, Judge Sprankle. I already done got found guilty.

"THE COURT: I am suggesting to you he might have been able to do better had you followed his advice.

"THE DEFENDANT: I talked to him once back in September.

"THE COURT: That is not true. That is not true, Mr. Brown.

We have set forth all of the colloquy pertaining to the representation of defendant appearing in the reporter's transcript so that it should be crystal clear that defendant was afforded the hearing envisioned by *People* v. *Marsden, supra,* 2 Cal.3d 118, and found to be lacking in *Brown* v. *Craven, supra,* 424 F.2d 1166.

Indeed, it is ironic to note that the counsel now complained of is the very one whom defendant had asked to be appointed; that halfway through his trial he started to praise the public defender whom he had previously objected to and that he did not start to absent himself from the courtroom until the day that the People put on evidence of a criminalist that could be construed to be highly damaging to defendant.

It would be stultifying to say that defendant's expressed dissatisfaction with his counsel is sufficient to win him a reversal or a new trial from a credulous appellate court. Defendant's refusal to cooperate, obviously, was a calculated gamble that such tactics would secure him a second reversal.

 We have not the slightest doubt that defendant's other point about counsel—that is that defendant was deprived of effective assistance of counsel by reason of the latter's failure to secure and present evidence of diminished capacity—is not well taken.

It is now argued that trial counsel should have (1) asked the court to examine defendant to determine his tolerance and reaction to the use of alcohol and seconal; (2) seen that defendant was advised to testify in his own defense so that the jury could be informed fully of the use of alcohol and seconal preceding his arrest; (3) asked defendant's son to describe his

---

"THE DEFENDANT: That is not true, Mr. Brown. Okay.

"THE COURT: The defendant having waived arraignment for judgment, and there appearing to be no legal cause why sentence should not be imposed, it will be the judgment of the Court that the defendant be sentenced to the State Prison for the period prescribed by law. That he be delivered by the Sheriff to the Director of Corrections to serve that sentence, and the defendant should receive credit for the time that he has been in the State Prison on the prior commitment.

"[DEFENSE COUNSEL]: Yes. If your Honor pleases, I would like the record to reflect, if possible, the following: namely, that I am not going to handle any appeal for Mr. Brown, but that under the provisions of law I felt it might [*sic*] obligation to prepare, and I do have an original and three copies, of a pro per notice of appeal for Mr. Brown to do whatever he wishes with.

"THE COURT: All right. You may deliver that.

"[DEFENSE COUNSEL]: And I would like to indicate for the record that if he wishes to appeal, it should be done within 10 days of today.

"THE DEFENDANT: Is there any way I can fill the papers now for appeal because where I have is no way.

"[DEFENSE COUNSEL]: I am also handing him all of my file, except my private notes to the defendant, Your Honor.

"THE COURT: All right.

"(Whereupon, the proceedings in the above-entitled matter were concluded.)"

father's condition; and (4) secured experts to testify as to the effect upon defendant as a result of his ingestion of drugs and alcohol.

Suggestions 1 and 4 both presume that there was evidence that defendant used alcohol and seconal immediately prior to decedent's death. In the absence of any such evidence, the examination and expert testimony requested would have been speculative and useless.

Insofar as suggestion number 2 is concerned, the quotations which we have set forth in footnote 8, *supra,* amply show that defendant was advised to testify insofar as the court could advise him. Counsel's suggestion that defendant not testify was clearly a tactical decision with which this court will not and should not be involved. (*People v. Cram,* 12 Cal.App.3d 37, 45 [90 Cal.Rptr. 393].) Indeed, given the nature of defendant's testimony and remarks to the court out of the presence of the jury, counsel may well have felt that for defendant to testify concerning drinking would harm him more than help.

It is clear that counsel was acutely aware of the possible existence of a defense of diminished capacity. Thus, the record shows, early in the trial, that the court asked defense counsel whether diminished capacity was going to be one of the defenses. Counsel stated:

"There is definite information that I have that the diminished capacity would be part of the defense.

"I have information that there was drinking on the part of Mr. Brown . . . . I intend to follow it up to the best of my ability. . . . Now, at the present juncture of the case, I will have to see what evidence I will be able to bring in, whether or not it will be brought in by my client or not.

"THE COURT: Well, have you prepared yourself with this defense in mind?

"[DEFENSE COUNSEL]: Well, yes. That is not the whole defense. That was an element that became apparent to me in talking to Mr. Brown when I first was appointed in August."

■ The applicable law is as follows:

"The constitutional right to the assistance of counsel in a criminal case [citations] includes the guarantee that such assistance be 'effective.' [Citations.] That 'effective' counsel required by due process, however, is not *errorless* counsel; rather, it is counsel 'reasonably likely to render, *and rendering* reasonably effective assistance.' [Citations.]

■ "Although the determination of whether the demands of due process have been met in a particular case is always 'a question of judgment and degree' to be answered in light of all the circumstances and with a view to 'fundamental fairness' [citations], certain general standards have evolved for the aid of the court making this determination. Fundamental among these is that which places upon counsel the duty to conduct careful factual and legal investigations and inquiries with a view to developing matters of defense in order that he may make informed decisions on his client's behalf both at the pleading stage [citations] and at trial [citations]. ■ If counsel's 'failure [to undertake such careful inquiries and investigations] result in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled.' [Citations.]" (*In re Saunders,* 2 Cal.3d 1033, 1041-1042 [88 Cal.Rptr. 633, 472 P.2d 921].)

■ While "[t]he failure to present the defense of diminished capacity is the withdrawal of a crucial defense within the foregoing principles, whether it is occasioned by ignorance of counsel . . . or by lack of preparation and investigation . . ." still a defendant must show an inadequacy as a demonstrable reality. (*People* v. *Cortez,* 13 Cal.App.3d 317, 328, 330 [91 Cal.Rptr. 660].) Here, as in *People* v. *Cram, supra,* 12 Cal. App.3d 37, 46, there is no suggestion that the defense of diminished capacity due to intoxication was withheld because of ignorance of facts which might raise it, and therefore, without any real judgment by counsel at all. This distinguishes the case at bench from *In re Saunders, supra.* Here, as in *Cram,* the evidence of intoxication is slight, if not nonexistent. Here, as in *Cram,* counsel rested his hope on another defense—the testimony of defendant's son that the decedent suffered the fatal injuries by reason of a blow on her head when she struck a coffee table while falling. There is nothing in this record to show that trial counsel had not investigated a possible defense of diminished capacity. (*People* v. *Roy,* 18 Cal.App.3d 537, 554 [95 Cal.Rptr. 884].)

The final suggested error on this point is that counsel should have asked defendant's son to describe his father's condition. The son was already badly impeached. At the trial under review here he testified that decedent fell and struck her head against the coffee table. At the first trial some four years earlier the son testified that the decedent remained in bed the entire evening of her death and did not get up at all. Since the son had also testified that defendant stayed in bed the entire evening of decedent's death, testimony that he was drinking on that evening would have been likewise subject to serious impeachment. There is no showing that the son was otherwise aware of his father's actions. This assignment of error is without merit.

## Contentions Concerning Defendant's
## Constitutional Rights

The last claim made by defendant is that it was in violation of his constitutional rights to allow Officer Hambley to testify that on October 12 defendant stated he had slapped the decedent.

The claim is that under the principles of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], defendant should have been advised of his constitutional rights *prior* to eliciting that information.

Before the court allowed this testimony into evidence it heard testimony from the officer, out of the presence of the jury. In full compliance with the federal mandate and with state practice, the court determined as a question of fact that defendant's statements were voluntarily made. Defendant's argument that his *Miranda* rights were violated are misplaced. Officer Hambley did regard him as a material witness and would have been unwilling to allow defendant to leave, but there is no evidence that defendant knew this. It is also true that the officer went to the scene because, according to his testimony, more investigation was needed, and that he had advised defendant that he was investigating the circumstances of the death.

The circumstances known to Officer Hambley and his state of mind as to defendant's status as a suspect are set forth in the factual recitation above. (See fn. 1, *supra,* and related text.) There is no showing that defendant was in custody. When the officer and his partner first arrived at defendant's apartment, defendant was dressed only in his underclothing and proceeded to move about the apartment dressing himself while talking to the officers. "Custody is an essential element of the accusatory stage." (*People* v. *Miller,* 71 Cal.2d 459, 481 [78 Cal.Rptr. 449, 455 P.2d 377].)

The trial court found that the questions asked of defendant before he became a suspect in Officer Hambley's mind were not the product of custodial interrogation. It is, of course, only such interrogation focusing on an *accused* which brings into play the requirements of the *Miranda* warning. (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 444 [16 L.Ed.2d 694, 706].)

That Officer Hambley was merely conducting an investigation is also borne out by the fact that he first became suspicious that a crime might have occurred and that defendant might be involved in it when defendant told the officer that he had slapped the decedent. Officer Hambley clearly had reason to investigate further when he was sent to the apartment, but that is not the same as probable cause to arrest. (Cf. *People* v. *Wright,* 273 Cal.App.2d 325 [78 Cal.Rptr. 75].) In *People* v. *Morse,* 70 Cal.2d

711 [76 Cal.Rptr. 391, 452 P.2d 607], our Supreme Court said at page 723, that it is not "to be assumed that any question put by any police officer to a person seriously suspected of crime must necessarily be prefaced by information or warnings as to constitutional rights." A fortiori this is so as to one not a suspect.

Even if we make the assumption, unsupported by the record, that defendant felt that he was not free to leave, we certainly would not be warranted in assuming that he felt he was arrested. Until such arrest, at the most there is a temporary detention which does not rise to the dignity of that custody which requires that constitutional warnings be given. (*People* v. *Manis*, 268 Cal.App.2d 653, 667 [74 Cal.Rptr. 423].)

In contrast to the situation presented in *Orozco* v. *Texas*, 394 U.S. 324 [22 L.Ed.2d 311, 89 S.Ct. 1095], defendant was not under arrest the moment that Officer Hambley came into the room. Further, the officer's questions here were much more of an exploratory nature than those in *Orozco* and were considerably less pointed than those found not to require constitutional warning in *People* v. *Morse, supra*. This is not a situation where defendant reasonably believed that his freedom of movement was restricted by the mere presence of official authority. (*People* v. *McLean*, 6 Cal.App.3d 300 [85 Cal.Rptr. 683].)

Officer Hambley was not required to give a *Miranda* warning to defendant.

### Disposition

The judgment is affirmed.

Stephens, J., concurred.

**KAUS, P. J.**—I concur in all respects, except that as far as the last point in the court's opinion is concerned, I would rest the affirmance solely on *People* v. *Manis*, 268 Cal.App.2d 653, 667 [74 Cal.Rptr. 423].

Appellant's petition for a hearing by the Supreme Court was denied August 9, 1972.